UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| NAOMI GUYNN-NEUPANE,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br><br>MAGNA LEGAL SERVICES. LLC, et al.,<br><br>　　　　　Defendants. | Case No.  19-cv-02652-VKD<br><br>**ORDER GRANTING DEFENDANTS'<br>MOTIONS FOR SUMMARY<br>JUDGMENT; DENYING AS MOOT<br>PLAINTIFF'S MOTION FOR CLASS<br>CERTIFICATION; GRANTING<br>MOTIONS TO SEAL**[1]<br><br>Re: Dkt. Nos. 48, 50, 51, 52, 57, 64, 68 |

Plaintiff Naomi Guynn-Neupane participated in a one-day jury research focus group in February 2019.  Shortly after, she filed the present putative class action for alleged violations of California's wage-and-hour laws, claiming that she and a putative class of focus group participants (i.e., mock jurors) were misclassified as independent contractors, rather than employees. Defendants are Magna Legal Services, LLC ("Magna"), the consulting company that conducted the focus group, and Wilkins Research Services, LLC ("Wilkins"), the company that recruited Ms. Guynn-Neupane and other focus group participants for Magna.

Magna and Wilkins each move for summary judgment on all claims for relief, arguing that as a matter of law, Ms. Guynn-Neupane is an independent contractor, and not an employee.  Ms. Guynn-Neupane opposes both motions.  She also concurrently filed a separate motion for class certification, which both Magna and Wilkins oppose.  The Court held a hearing on all three motions.  Upon consideration of the moving and responding papers,[2] as well as the oral arguments

---

[1] All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by a magistrate judge.  28 U.S.C. § 636(c); Fed. R. Civ. P. 73; Dkt. Nos. 10, 12, 34.

[2] The Court previously struck a portion of Ms. Guynn-Neupane's original opposition papers,

United States District Court<br>Northern District of California

presented, the Court grants Magna's motion for summary judgment, grants Wilkins's motion for summary judgment, and denies as moot Ms. Guynn-Neupane's motion for class certification.[3]

## I.    EVIDENTIARY OBJECTIONS AND REQUESTS FOR JUDICIAL NOTICE

As discussed below, the material facts in this case are undisputed.  The Court nevertheless addresses Ms. Guynn-Neupane's main evidentiary objections that are relevant to the resolution of defendants' respective motions for summary judgment.  Other objections are addressed as necessary below.

Ms. Guynn-Neupane asserts a number of objections to the declarations of Mark Calzaretta (a founding partner of Magna and its Vice President of Litigation Consulting), Kellie Janke (a Magna Senior Litigation Consultant), and Lynn Wilkins[4] (Wilkins's co-owner and partner).  The testimony in question and Ms. Guynn-Neupane's objections are identical across both motions for summary judgment.  *See* Dkt. Nos. 48-1, 48-2, 48-3, 52-1, 52-2, 52-3, 61 at 27-30, 62 at 29-30.  Accordingly, the Court addresses Ms. Guynn-Neupane's objections in both motions together.

Ms. Guynn-Neupane argues that portions of Mr. Calzaretta's declaration and Ms. Janke's declaration discussing Magna's screener script, written Executive Summary Report, and a UPS delivery receipt violate the best evidence rule, which provides that the original of a "writing, recording, or photograph" is required to prove the contents thereof.  Fed. R. Evid. 1002.  Ms. Guynn-Neupane asserts the same objection to portions of Ms. Wilkins's declaration addressing

---

which were well in excess of the page-limits set by the Court's Civil Local Rules.  *See* Dkt. No. 56; Civil L.R. 7-3.  Ms. Guynn-Neupane subsequently filed an amended opposition.  Dkt. No. 62.  Ms. Guynn-Neupane objected that Magna's original notice of motion caused Magna's opening motion to be 2 pages too long (Dkt. No. 62 at 30).  Magna submitted an amended opening brief (Dkt. No. 64), which is the brief that the Court has considered.

[3] The Court finds compelling reasons to grant motions to seal certain exhibits submitted in connection with Ms Guynn-Neupane's motion for class certification (Dkt. Nos. 50, 57, 68), as those materials reveal confidential information from the underlying personal injury litigation, and otherwise implicate personal privacy interests of the focus group participants.  *See Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178-79 (9th Cir. 2006) ("Those who seek to maintain the secrecy of documents attached to dispositive motions must meet the high threshold of showing that 'compelling reasons' support secrecy.").  In any event, none of the sealed information has any bearing on the resolution of the present motions for summary judgment.

[4] Ms. Wilkins is identified as "Lynn Wilkins" in her declarations, but apparently as "Lynn Wilkins Crabtree" in transcripts of her deposition testimony.  For convenience, and to avoid confusion, the Court refers to cited excerpts of her deposition transcripts as "Crabtree Dep."

United States District Court
Northern District of California

certain email communications between Ms. Guynn-Neupane and Wilkins. Insofar as the

challenged testimony is offered to prove the contents of the referenced documents, each declarant

has, for the most part, submitted copies of the pertinent documents, as to which no questions have

been raised about authenticity or admissibility. *See* Fed. R. Evid. 1003. Ms. Guynn-Neupane's

objections based on the best evidence rule are overruled as to Dkt. No. 48-1 ¶¶ 13, 15; Dkt. No.

48-2 ¶ 15-18, 76-82; Dkt. No. 48-3 ¶¶ 20-22; Dkt. No. 52-1 ¶¶ 20-22; Dkt. No. 52-2 ¶ 15-18, 76-

82; Dkt. No. 52-3 ¶¶ 13, 15. However, Ms. Guynn-Neupane's objection is sustained with respect

paragraph 70 of Ms. Janke's declaration to the extent that Ms. Janke seeks to prove the contents of

a referenced UPS delivery receipt (which Ms. Janke apparently intended to, but did not submit

with her declaration) to establish that Magna sent Ms. Guynn-Neupane a replacement check. As

discussed below, however, it is undisputed that Ms. Guynn-Neupane received full payment from

Magna for her participation in the study.

Ms. Guynn-Neupane objects to portions of the declarations of Mr. Calzaretta, Ms. Janke,

and Ms. Wilkins on the ground that the proffered testimony is either inconsistent with the

declarants' respective deposition testimony, is conclusory in violation of Civil Local Rule 7-5(b),[5]

or is both conclusory and inconsistent with deposition testimony. Ms. Guynn-Neupane requests

that the Court review the entire record, including excerpts of each declarants' deposition testimony

that she submitted in support of her opposition to summary judgment, and that it not rely on the

challenged portions of defendants' declarations. Except for matters that have been stricken or

amended (as noted above), the Court has considered the briefs and supporting papers submitted by

all parties, including the declarants' deposition testimony. The Court does not find that the

challenged portions of the declarations contradict the deposition testimony. Nor has Ms. Guynn-

Neupane demonstrated that the challenged declarations are conclusory, notwithstanding that the

declarants may have "testified at length" about certain matters in deposition. Ms. Guynn-

Neupane's objections are overruled as to Dkt. No. 48-1 ¶¶ 15, 20, 31; Dkt. No. 48-2 ¶¶ 30, 37, 38,

---

[5] "An affidavit or declaration[] may contain only facts, must conform as much as possible to the requirements of Fed. R. Civ. P. 56(e), and must avoid conclusions and argument. Any statement made upon information or belief must specify the basis therefor. An affidavit or declaration not in compliance with this rule may be stricken in whole or in part." Civil L.R. 7-5(b).

41, 45, 52, 59; Dkt. No. 48-3 ¶¶ 9-11; Dkt. No. 52-1 ¶¶ 9-11; Dkt. No. 52-2 ¶¶ 30, 37, 38, 41, 45, 52, 59; Dkt. No. 52-3 ¶¶ 15, 20, 31.  As discussed below, to the extent paragraph 9 of Ms. Janke's declaration may be "inconsistent" in describing the job title of a Magna employee as "Technical Consultant" in her declaration, but as "litigation consultant and research coordinator" in deposition, the Court finds any inconsistency to be immaterial to the resolution of the issues presented.  *See* Dkt. No. 48-2 ¶ 9; Dkt. No. 54-3, Ex. F (Janke Dep. 25:17-19); Dkt. No. 52-2 ¶ 9; Dkt. No. 61-3, Ex. F (Janke Dep. 25:17-19).

Defendants' request for judicial notice of certain legislative materials (Dkt. Nos. 49, 53) concerning Assembly Bill 2257 ("AB 2257") is granted.  Fed. R. Evid. 201.

## II.     BACKGROUND

### A.     Defendants' Businesses

Defendant Magna describes itself as an "end-to-end legal services firm" that provides consulting, deposition, and record retrieval services for its clients.  Dkt. No. 48-1 ¶ 7.  Magna's "consulting services include jury consulting, graphic consulting, and trial presentation services meant to assist clients in preparing for all stages of litigation, including hearings, depositions, mediations, and trials."  *Id.*  "Jury consulting includes its own full suite of services," such as "in-person and online focus group research studies, jury profiling studies, attitudinal surveys, change-of-venue surveys, damages assessments, predictive modeling, mock trials, jury selection, strategic development, witness preparation training, and shadow juries."  *Id.*

Defendant Wilkins "is primarily a data collection agency that gathers and compiles healthcare data from hospitals, physician's offices, and medical facilities.  Located in Chattanooga, Tennessee, Wilkins operates a call center and currently employs approximately 111 employees, the vast majority of whom work at its call center."  Dkt. No. 52-1 ¶ 3.  Wilkins says that it has never had any employees work from California.  *Id.*  "In addition to medical data collections, Wilkins also provides the following services:  roundtable focus group[s] for consumers, shop-along market research, product placement, research panels on education, consumer issues, and politics, political research, and jury research."  *Id.* ¶ 4.

United States District Court
Northern District of California

**B.      Focus Group Recruitment Process**

In January 2019, Magna was retained by a client to provide jury consulting services in a personal injury lawsuit for the purpose of evaluating the effectiveness of trial themes and refining the client's overall litigation strategy in preparation for trial.  Dkt. No. 48-2 ¶ 8.  Magna assigned the matter, referred to as the "AGC-012 project," to a consulting team comprised of two litigation consultants and a consultant/research coordinator,[6] who reviewed the case file and met with the client to discuss the case and the goals of Magna's engagement.  *Id.* ¶¶ 9, 10; Dkt. No. 54-3, Ex. F (Janke Dep. 25:17-19).  Magna says that as part of many consulting engagements, it provides clients with advice and recommendations in the form of a written report based on its expertise, research, and data analysis.  Dkt. No. 48-1 ¶ 23.  Magna's consultants produce the written work product that is provided to Magna's clients and which Magna says represents hundreds to thousands of hours of work by its consultants.  *Id.* ¶ 24.

Clients do not specifically engage Magna to conduct jury research using focus groups.  Dkt. No. 48-1 ¶ 10.  Depending on the circumstances, Magna may conduct one or more focus groups within a single consulting engagement.  However, focus groups are not always necessary, and a particular engagement may be accomplished without any focus group ever being conducted.  *Id.*  Whenever it does conduct a focus group, Magna does not itself recruit participants.  Magna instead engages firms such as Wilkins to identify and recruit eligible participants.  Dkt. No. 48-1 ¶ 12; Dkt. No. 48-3 ¶ 5; Dkt. No. 52-1 ¶ 5; Dkt. No. 52-3 ¶ 12; Dkt. No. 54-3, Ex. D (Calzaretta Dep. 84:20-85:14); Dkt. No. 61-3, Ex. C (Crabtree Depo 51:3-13); Dkt. No. 61-3, Ex. D (Calzaretta Dep. 85:3-14).  To assist the recruiting firms, Magna develops a script to identify potential focus group participants who meet certain criteria and who are representative of the jury pool in the relevant venue.  The script contains questions that screen out individuals based on several factors, including their demographic and background information.  Magna also provides

---

[6] As discussed above, Ms. Guynn-Neupane objects that in her declaration Ms. Janke refers to Ben Scrimalli as a technical consultant, but testified in deposition that he is a litigation consultant and research coordinator.  Dkt. No. 61 at 29.  The Court refers here to Mr. Scrimalli as both a consultant and research coordinator, but finds that his proper job title is immaterial to the resolution of the present motions for summary judgment.

United States District Court
Northern District of California

1    the recruiting firms with an Excel template to input participants' names, demographic information,

2    and contact information.  Dkt. No. 48-1 ¶¶ 13, 14, Ex. 1; Dkt. No. 48-3 ¶ 15; Dkt. No. 54-3, Ex. C

3    (Crabtree Dep. 12:1-6, 63:4-64:20; Ex. 2); Ex. D (Calzaretta Dep. 64:9-65:1, 73:10-25, 75:15-

4    76:5, 76:11-17, 87:7-88:17; Exs. 14-15); Ex. F (Janke Dep. 27:12-19); Dkt. No. 61-3, Ex. C

5    (Crabtree Dep. 63:4-64:20; Ex. 2); Ex. D (Calzaretta Dep. 75:15-76:5, 76:11-17).  Ultimately,

6    Magna determines whether an individual fits the criteria for a particular study.  Dkt. No. 54-3, Ex.

7    C (Crabtree Dep. 58:15-17); Dkt. No. 61-3, Ex. C (Crabtree Dep. 58:15-17).

8            As part of its work on the AGC-012 project, on February 21, 2019 Magna convened a one-

9    day, in-person jury research focus group in Monterey, California.  Dkt. No. 48-2 ¶ 11.  Magna

10   engaged Wilkins to identify and invite focus group participants and also provided Wilkins with the

11   script and Excel template to use in identifying eligible individuals.  Dkt. No. 48-1 ¶ 14, Ex. 1; Dkt.

12   No. 52-1 ¶¶ 6-7, Ex. 1; *see also* Dkt. No. 54-3, Ex. C (Crabtree Dep. 12:1-6, 53:7-21; 57:24-58:14,

13   Ex. 2); Dkt. No. 61-3, Ex. C (Crabtree Dep. 53:7-21; 56:19-58:14, Ex. 2).  The AGC-012 screener

14   script,[7] which Magna says is representative of the script used for all of its jury research focus

15   groups, filters out individuals based on a number of factors, including those who participated in

16   "jury research" in the past four years or in any "focus group or market research study" in the past

17   18 months.  Dkt. No. 48-1 ¶ 14, Ex. 1 at MLS000044.  Upon receipt of the script, Wilkins says it

18   posted an ad on social media, advertising the AGC-012 focus group as a one-time paid research

19   study.  Dkt. No. 48-3 ¶ 9; 52-1 ¶ 9; Dkt. No. 54-3, Ex. C (Crabtree Dep. 56:19-57:15); Dkt. No.

20   61-3, Ex. C (Crabtree Dep. 56:19-57:15).  Wilkins called potential participants who responded to

21   the ad and read the script to them in order to identify those who met the qualifying criteria.  Dkt.

22   No. 54-3, Ex. C (Crabtree Dep. 53:7-21, 58:3-9, 66:2-20, Ex. 2); Ex. D (Calzaretta Dep. 96:3-20);

23

24   _____

[7] Magna has redacted portions of the script that it says reveal confidential information regarding
25   the underlying personal injury litigation, including the names of parties and third-parties.  Dkt. No.
     48-1 ¶ 14, Ex. 1.  Similarly, Wilkins has redacted portions of the template used for the AGC-012
26   project that identify the focus group participants' names, contact and other identifying
     information.  Dkt. No. 52-1 ¶ 13, Ex. 2.  Although defendants have not formally moved to seal
27   that information, the Court will allow the redactions based on defendants' representations as to the
     personal and confidential nature of the information.  *See Kamakana*, 447 F.3d at 1178-79.  In any
28   event, none of that information is material to the resolution of the present motions.

Dkt. No. 61-3, Ex. C (Crabtree Dep. 53:7-21, 58:3-9, 66:2-20, Ex. 2); Ex. D (Calzaretta Dep. 96:3-20).  Those who qualified were invited to participate in the focus group.  Dkt. No. 54-3, Ex. C (Crabtree Dep. 53:7-17); Dkt. No. 61-3, Ex. C (Crabtree Dep. 53:7-17).

Through this process, Ms. Guynn-Neupane was identified and recruited as an individual eligible to participate in the February 21, 2019 AGC-012 focus group.  Dkt. No. 48-2 ¶ 20; Dkt. No. 52-2 ¶ 20; Dkt. No. 54-3, Ex. F (Janke Dep. 35:20-22); Dkt. No. 61-3, Ex. F (Janke Dep. 35:20-22).  The parties do not dispute that participation in the study was voluntary.  *See* Dkt. No. 48-3 ¶ 11; 52-1 ¶ 11; Dkt. No. 54-3, Ex. C (Crabtree Dep. 56:19-57:15); Dkt. No. 61-3, Ex. C (Crabtree Dep. 56:19-57:15).  Additionally, no special training or preparation was required to pass the screening process or to participate in the focus group, and Ms. Guynn-Neupane did not attend any special training or otherwise do anything to prepare for the focus group.  Dkt. No. 48-1 ¶ 15; Dkt. No. 52-3 ¶ 15; Dkt. No. 54-3, Ex. B (Guynn-Neupane Dep. 33:11-16); Dkt. No. 61-3, Ex. B (Guynn-Neupane Dep. 33:11-16).

After verbally accepting the invitation to participate in the focus group, Ms. Guynn-Neupane says that she was given several instructions, including that she must "show up on time and participate until the end of the session" in order to receive the full $260 payment for her participation; if she was dismissed from the study within the first hour of the session, she would be paid $150 for just showing up; if she "[chose] to leave the research for any reason, [she] w[ould] not be paid for the session"; she was prohibited from referring others to participate in the mock jury session, which would result in dismissal from the jury research session without pay; and she was told not to leave the site for the lunch break.  Dkt. No. 54-3, Ex. B (Guynn-Neupane Dep. 63:19-64:2); Dkt. No. 54-3, Ex. C (Crabtree Dep. 64:25-65:12; 66:2-20; Ex. 2); Dkt. No. 61-3, Ex. C (Crabtree Dep. 64:25-65:12; 66:2-20; Ex. 2).

At the time of the AGC-012 jury study, Ms. Guynn-Neupane was employed on a full-time basis at Employnet, a staffing agency, where she worked from approximately June 2018 until August 2019.  Dkt. No. 54-3, Ex. B (Guynn-Neupane Dep. 13:8-12, 14:12-19, 15:22-25); Dkt. No. 61-3, Ex. B (Guynn-Neupane Dep. 13:8-12, 14:12-19, 15:22-25).  Her job duties and responsibilities at Employnet included recruiting and interviewing individuals for job placements,

calling clients, collecting time cards, and confirming that candidates were timely paid for the hours they worked.  Dkt. No. 54-3, Ex. B (Guynn-Neupane Dep. 13:8-14:19, 15:22-25).

Ms. Guynn-Neupane avers that no one at Magna or Wilkins ever told her whether she would function as an employee or as an independent contractor in her role as a focus group participant.  Dkt. No. 54-2 ¶ 4; Dkt. No. 61-2 ¶ 4.  There is no evidence that she signed any agreement as to her employee or independent contractor status.  For her participation in the study, Magna paid Ms. Guynn-Neupane a lump sum of $260, including $10 for parking.  Dkt. No. 48-2 ¶ 69; Dkt. No. 52-2 ¶ 69.

Several days prior to the AGC-012 focus group, Wilkins staff made courtesy calls to the participants to confirm that they were still interested in participating in the study and to reiterate the time and location of the study.  Dkt. No. 52-1 ¶ 16.  Two days before the study, on February 19, 2019, Wilkins staff emailed participants to confirm their participation in the focus group.  *Id*. ¶ 17, Ex. 3.  The February 19 email was based on a template Wilkins uses for Magna engagements and contained language similar to the invitation recited in the screener script.  *Id*.  On February 20, 2019, the day before the study, Wilkins sent a final email to participants to remind them of the study and to advise them to plan for traffic.  *Id*. ¶ 18, Ex. 4.

Wilkins says that it ordinarily would have no further contact with the participants for this kind of in-person jury research conducted by Magna.  Dkt. No. 52-1 ¶ 19.  In this particular case, however, Wilkins had some further email communication with Ms. Guynn-Neupane.  On the morning of the study, Ms. Guynn-Neupane responded to Wilkins's February 19, 2019 email to advise that she was running late.  *Id*., Ex. 3.  Additionally, after the AGC-012 focus group was completed, Ms. Guynn-Neupane responded to Wilkins's February 20, 2019 email and requested a replacement check, stating that she lost the one given to her by Magna for her participation in the study.  *Id*. ¶ 20, Ex. 4.  Because Magna issued the check, Wilkins's staff told Ms. Guynn-Neupane that Wilkins would reach out to Magna and see what Magna could do.  *Id*. ¶ 21, Ex. 4.  Wilkins's staff then forwarded Ms. Guynn-Neupane's email to Magna.  *Id*. ¶ 22.  Magna claims that it sent a

replacement check to Ms. Guynn-Neupane at her address,[8] and it is undisputed that Ms. Guynn-Neupane received full payment from Magna for her participation in the study.  Other than its involvement in the recruiting process described above, and the additional email communications with Ms. Guynn-Neupane, there is no indication that Wilkins had any other role in the planning or administration of the AGC-012 focus group.  Dkt. No. 48-3 ¶ 23; Dkt. No. 52-1 ¶ 23.

### C.    The February 21, 2019 Focus Group

Participants were asked to arrive at the focus group by 8:15 a.m.  Dkt. No. 48-4 ¶ 3, Ex. 1 (Guynn-Neupane Dep. at 39:2-3); Dkt. No. 48-3 ¶ 17, Ex. 3; Dkt. No. 52-1 ¶ 17, Ex. 3.  Ms. Guynn-Neupane did not arrive at the focus group until around 8:45 a.m., but she nonetheless was able to participate in the focus group and received the full $260 compensation from Magna at the end of the study.  Dkt. No. 48-4 ¶ 3, Ex. 1 (Guynn-Neupane Dep. at 42:13-16; 43:1-11).

After checking in with Magna's consulting team, focus group participants, including Ms. Guynn-Neupane, were required to sign a non-disclosure agreement ("NDA").  The NDA prohibited participants from "directly or indirectly, disclos[ing] to any third party any confidential information or trade secrets," except as required in the course of the participant's interactions with Magna.  Dkt. No. 48-2 ¶ 29, Ex. 4.  Magna says that the NDA was necessary to protect confidential information in the underlying litigation that would be used in the course of the study.  *Id*.  Additionally, each participant was given a hand-held keypad to be used in responding to questions during the study.  *Id*. ¶ 28.

The AGC-012 focus group consisted of a morning session and an afternoon session.  The consulting team began the morning session by administering a pre-stimulus juror questionnaire that asked about the participants' demographic information and sought their responses regarding issues pertaining to the underlying personal injury lawsuit.  Dkt. No. 48-2 ¶¶ 25, 30-33 and Ex. 5 at MLS601-624.  Magna says that the data collected during this portion of the study is quantitative and measures the participants' verdict orientation, their desire for each party to prevail in the

---

[8] As discussed above, Ms. Guynn-Neupane's objections to paragraph 70 of Ms. Janke's declaration are sustained.

United States District Court
Northern District of California

underlying litigation, and their desire to compensate the plaintiffs with money damages.  *Id.* ¶ 25.

Magna's lead consultant, Kellie Janke, then gave an orientation advising the participants that they would serve as mock jurors in the underlying personal injury lawsuit.  Dkt. No. 48-2 ¶¶ 36-37; *see also* Dkt. No. 54-3, Ex. F (Janke Dep. 72:25-74:25).  Ms. Janke also provided the participants with certain rules and guidelines that applied to the study.  Magna says that these rules were meant to track court rules that apply during actual jury trials.  Dkt. No. 48-2 ¶¶ 36, 38.  Although the parties dispute the significance of those study parameters, for present purposes it is undisputed that as a focus group participant, Ms. Guynn-Neupane was asked to comply with several instructions, including that participants were (1) asked not to use their cellphones and to silence or turn their phones off; (2) instructed not to discuss the case with other participants until juror deliberations; (3) instructed not to talk during presentations and to hear all of the evidence and arguments presented by each side in order to deliberate; and (4) instructed to stay on site for the duration of the focus group, including during lunch and rest breaks.  *Id.* ¶ 38; Dkt. No. 48-4 ¶ 3, Ex. 1 (Guynn-Neupane Dep. 52:18-20; 53:3-5); *see also* Dkt. No. 54-3, Ex. F (Janke Dep. 72:25-76:9).

Throughout the day, Magna provided several breaks lasting from 5 to 20 minutes each, as well as a lunch break.  Dkt. No. 54-3, Ex. F (Janke Dep. 96:2-11, 115:9-14; Ex. 13).  Before each break, Magna reminded jurors not to talk to anyone about the case, not to conduct outside research, and to stay on-site.  Dkt. No. 54-3, Ex. B (Guynn-Neupane Dep. 62:5-12, 63:19-64:2, 70:13-16); Ex. F (Janke Dep. 88:10-89:25, 96:12-22, 97:7-19, 103:4-12); *see also* Dkt. No. 48-2 ¶¶ 45-46.

Following the mock trial presentations, the consulting team read mock jury instructions to the participants and administered a post-presentation questionnaire, to which participants responded and which Magna says was designed to assess the participants' verdict orientation and attitudes about the underlying case and the parties.  Dkt. No. 48-2 ¶ 49.

Completion of the post-presentation questionnaire was followed by the lunch break.  Lunch was provided on site by Magna.  Dkt. No. 54-3, Ex. D (Calzaretta Dep. 117:7-21).  Magna's consulting team again reminded participants that during the lunch break they were not to

1    conduct outside research or discuss the case with one another.  Dkt. No. 48-2 ¶ 52; Dkt. No. 54-3,

2    Ex. B (Guynn-Neupane Dep. at 70:13-16); Dkt. No. 54-3, Ex. F (Janke Dep. at 103:4-12).  Ms.

3    Guynn-Neupane testified that Magna also instructed participants to stay on site during breaks,

4    including the lunch break.  Dkt. No. 54-3, Ex. B (Guynn-Neupane Dep. at 63:19-64:2).  Magna

5    does not refute that assertion, but contends that due to other lunch break duties, its staff could not

6    monitor participants to see if they went off premises; no participant informed Ms. Janke that they

7    were going off site during the lunch break; and if any participant did ask, Ms. Janke would have

8    told the participant that it was fine to leave the premises for lunch.  Dkt. No. 48-2 ¶ 53.

9         Following the lunch break, the focus group afternoon session consisted of a mock jury

10   deliberation session and guided post-verdict discussion.  Dkt. No. 48-2 ¶ 26.  Magna's consulting

11   team divided the participants into three deliberation groups of 12 participants each based on their

12   responses to the morning session questionnaires.  *Id.* ¶¶ 54-55.  Each of the three consulting team

13   members facilitated a deliberation group.  *Id.* ¶ 56.  Ms. Guynn-Neupane was assigned to

14   Deliberation Group C, which was facilitated by Ms. Janke.  *Id.*  Ms. Janke provided the group with

15   copies of the mock verdict form and the mock jury instructions, and told the participants that they

16   could now discuss the case.  She nonetheless asked that they not discuss the case unless all 12

17   group members were present and that they not use their cellphones during deliberations.  *Id.* ¶¶ 57-

18   59; Dkt. No. 54-3, Ex. F (Janke Dep. 110:12-112:2).  Ms. Janke also asked the foreperson to

19   submit the verdict form to her at the end of the day, but says that a completed verdict form was not

20   actually required because the ultimate goal of the focus group "was to collect qualitative data in

21   the form of the participants['] opinions, motivations, and attitudes, in a mock jury deliberation

22   setting while using the verdict form as a guide."  Dkt. No. 48-2 ¶¶ 26, 60.  Ms. Janke left the room

23   and observed the group's deliberations from a different room, but she returned to the deliberation

24   room a few times to answer participants' questions and to ask them to speak one at a time.  *Id.*

25   ¶ 64.  At the conclusion of the deliberations, Ms. Janke facilitated a post-verdict moderated

26   discussion, which Magna says is another means for gathering qualitative data for analysis.  *Id.*

27   ¶ 66.

28        The AGC-012 focus group concluded at approximately 5:30 p.m., and Ms. Guynn-

United States District Court
Northern District of California

Neupane was given a check from Magna for $260.  Dkt. No. 48-2 ¶ 69.  Magna's consulting team subsequently provided a 151-page written report to Magna's client based on Magna's analysis of the research and quantitative and qualitative data collected during the AGC-012 focus group.  *Id*. ¶ 74, Ex. 5.

### D.     Procedural History

Ms. Guynn-Neupane originally filed the present lawsuit in the Monterey County Superior Court.  Magna, with Wilkins's consent, removed the matter to this Court, asserting jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  Dkt. Nos. 1, 3.  The Court subsequently granted the parties' stipulated request to permit the filing of the First Amended Complaint ("FAC"), which asserts 10 claims for relief under the California Labor Code, the California Private Attorneys General Act, and the California Business and Professions Code.  Dkt. No. 15.  The FAC remains the operative pleading and alleges that defendants failed to comply with California's wage and hour laws and Industrial Welfare Commission ("IWC") Order No. 4-2001 by failing to provide meal and rest periods; pay hourly and overtime wages; pay minimum wages; provide accurate wage statements; timely pay wages; pay agreed wages; and pay all wages upon termination of employment.[9]  Ms. Guynn-Neupane's claims are premised on the theory that Magna and Wilkins are joint employers.  *See id*. ¶ 8.  No one disputes that in order to recover for the alleged wage-and-hour violations, Ms. Guynn-Neupane must establish that she was defendants' employee.

Magna and Wilkins each move for summary judgment on all claims for relief on the ground that Ms. Guynn-Neupane is, at most, an independent contractor, and not an employee.  As

---

[9] The claims asserted in the FAC are as follows:  (1) failure to provide meal periods, Cal. Labor Code §§ 226.7, 1198; (2) failure to provide rest periods, Cal. Labor Code §§ 226.7, 1198; (3) failure to provide hourly and overtime wages, Cal. Labor Code §§ 1194, 1198, 1199; (4) failure to pay minimum wages, Cal. Labor Code §§ 1194, 1197; (5) failure to provide accurate wage statements, Cal. Labor Code §§ 226, 1174,1175; (6) failure and refusal to pay agreed wages, Cal. Labor Code §§ 201, 202, 204, 216, 218, 221, 223, 1194,1198; (7) failure to pay all wages upon termination, Cal. Labor Code §§ 201-203; (8) failure to timely pay wages, Cal. Labor Code § 204; (9) unfair business practices, Cal. Bus. & Prof. Code § 17200, *et seq*.; and (10) Private Attorneys General Act, Cal. Labor Code § 2698*, et seq*.  Dkt. No. 15.

United States District Court
Northern District of California

noted above, there are no apparent disputes regarding material facts, and the question of Ms. Guynn-Neupane's employee or independent contractor status therefore presents a question of law.[10] The primary point of contention is what legal test applies and what conclusions should be drawn from the undisputed facts in determining whether Ms. Guynn-Neupane properly is classified as an independent contractor or an employee with respect to her participation as a mock juror in the AGC-012 focus group.

## III.   LEGAL STANDARD

### A.   Summary Judgment

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In order to meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party meets its initial burden, the burden shifts to the non-moving party to produce evidence supporting its claims or defenses. *See id.* at 1102. The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. *See id.* A genuine issue of fact is one that could reasonably be resolved in favor of either party. A dispute is "material" only if it could affect the outcome of the suit under the governing law. *Anderson*, 477

---

[10] The determination of employee or independent contractor status is one of fact if the determination depends on the resolution of disputed evidence or inferences. But if the evidence is undisputed, the question becomes one of law. *S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal. 3d 341, 349 (1989).

U.S. at 248-49.

"When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting *Celotex Corp.*, 477 U.S. at 325). Once the moving party meets this burden, the nonmoving party may not rest upon mere allegations or denials, but must present evidence sufficient to demonstrate that there is a genuine issue for trial. *Id.*

"It is reasonable to consider a Rule 56 motion [before a class certification motion] when early resolution of a motion for summary judgment seems likely to protect both the parties and the court from needless and costly further litigation." *Wright v. Schock*, 742 F.2d 541, 544 (9th Cir. 1984). "Where the defendant assumes the risk that summary judgment in his favor will have only a stare decisis effect on the members of the putative class," the "proper approach" is for the "court to rule on the summary judgment motion first." *Id.*; *see also Kim v. Commandant*, 772 F.2d 521, 524 (9th Cir. 1985) (granting summary judgment before ruling on class certification motion, rejecting contention that "it was improper for the district court to decide the merits of the case prior to a ruling on class certification").[11]

### B.     Legal Framework

In *S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal. 3d 341 (1989), the California Supreme Court set out a framework for classifying workers as either employees or independent contractors. *Borello* recites indicia of an employer-employee relationship, including "the right to control work details," "whether the one performing services is engaged in a distinct occupation or business," and "whether or not the work is a part of the regular business of the

---

[11] Neither side has commented on the order in which the Court should address defendants' respective summary judgment motions and Ms. Guynn-Neupane's motion for class certification. The Court finds that it will be more practicable and efficient to resolve defendants' summary judgment motions first. The gravamen of defendants' respective motions for summary judgment is that Ms. Guynn-Neupane properly is classified as an independent contractor. For the reasons discussed below, the Court concludes that defendants are correct. Ms. Guynn-Neupane's claims therefore fail, and her motion for class certification is moot. The judgment will not be res judicata as to members of any class that may be certified, and the Court concludes that resolution of the present motions for summary judgment is "likely to protect both the parties and the court from needless and costly further litigation." *Wright*, 742 F.2d at 544.

United States District Court
Northern District of California

principal." *Id*. at 350-51.  Nearly thirty years later, in *Dynamex Operations West, Inc. v. Super. Ct*., 4 Cal. 5th 903 (2018), the California Supreme Court adopted a standard often referred to as the "ABC" test, in which a worker is presumed to be an employee unless the hiring entity shows that each of three requirements is satisfied:

> (a) that the worker is free from the control and direction of the hirer in connection with the performance of the work, both under the contract for the performance of the work and in fact; *and* (b) that the worker performs work that is outside the usual course of the hiring entity's business; *and* (c) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed.

*Id*. at 955-56.  The California legislature has since codified the ABC test, now embodied in section 2775 of the California Labor Code.[12]

The Labor Code exempts certain businesses and services from the ABC test.  *See* Cal. Labor Code §§ 2776-2784.  At issue in the present motions for summary judgment is whether Magna and Wilkins each qualify for the "data aggregator" exemption to the ABC test under California Labor Code § 2782.[13]  If so, "then Section 2775 and the holding in *Dynamex* do not apply to that entity, and instead the determination of an individual's employment status as an employee or independent contractor shall be governed by *Borello*."  Cal. Labor Code § 2785(d); *see also id*. § 2782(a)(1) (providing that if certain conditions are met, then "Section 2775 and the holding in *Dynamex* do not apply to the relationship between a data aggregator and an individual providing feedback to the data aggregator, and instead the holding in *Borello* shall apply [.]").[14]

---

[12] The ABC test previously was codified in former California Labor Code § 2750.3, which was repealed and replaced with California Labor Code § 2775, effective September 4, 2020, with the enactment of AB 2257.  AB 2257 revised exemptions to the ABC test, but did not change the portion of the existing law that set out the ABC test itself.  *See* Dkt. Nos. 49, 53.

[13] No one disputes that defendants may attempt to avail themselves of the "data aggregator" exemption, notwithstanding that the statutory exemption passed into law after the February 2019 jury focus group at issue.  While provisions in the current law concerning a worker's status "shall apply to work performed on or after January 1, 2020," "[i]nsofar as the application of Sections 2776 to Section 2784 would relieve an employer from liability, those sections shall apply retroactively to existing claims and actions to the maximum extent permitted by law."  Cal. Labor Code § 2785(b), (c).

[14] Earlier this year, the California Supreme Court held that the ABC test applies retroactively to "all cases not yet final as of the date our decision in *Dynamex* became final[.]"  *Vazquez v. Jan-*

15

United States District Court
Northern District of California

To the extent it can be said that there was any sort of employment relationship with Ms. Guynn-Neupane, defendants contend that they each meet the criteria for the "data aggregator" exemption and that under *Borello*, Ms. Guynn-Neupane properly is classified as an independent contractor. But if they do not qualify as "data aggregators," defendants maintain that Ms. Guynn-Neupane is an independent contractor, even under the ABC test. Ms. Guynn-Neupane argues that neither defendant qualifies as a "data aggregator" and therefore the ABC test applies. In any event, she contends that defendants have not met their burden under either *Borello* or the ABC test to demonstrate that she is an independent contractor, as opposed to an employee.

## IV.   DISCUSSION

### A.   Ms. Guynn-Neupane's Rule 56(d) Request for Continuance

Pursuant to Rule 56(d) Ms. Guynn-Neupane requests that the Court defer ruling on defendants' motions for summary judgment to permit her to conduct discovery regarding the "data aggregator" exemption to the ABC test.

Rule 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:  (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."  Fed. R. Civ. P. 56(d).  "To prevail on a request for additional discovery under Rule 56(d), a party must show that (1) it has set forth in affidavit form the specific facts it hopes to elicit from further discovery; (2) the facts sought exist;

---

*Pro Franchising Int'l, Inc.*, 10 Cal. 5th 944, 948 (2021).  In so holding, the Supreme Court noted that *Borello* never applied to wage claims.  *See id.* at 953 (stating that "*Borello* was not a wage order case and that decision did not purport to determine who should be interpreted to be an employee for purposes of a wage order.  We resolved this question for the first time in *Dynamex*.").  Nevertheless, the plain language of the pertinent Labor Code sections provide that if conditions for application of the "data aggregator" exemption are met, then the standard set out in *Borello* is to be applied to Ms. Guynn-Neupane's wage claims.  Cal. Labor Code §§ 2785(d), 2782(a)(1); *see also* Cal. Assemb. Jour., 2019-2020 Reg. Sess., No. 218 at 147 ("The fundamental purpose of AB 2257 is to clarify the application of the California Supreme Court's unanimous decision in *Dynamex Operations West, Inc. v. Superior Court of Los Angeles* (2018) 4 Cal.5th 903 (*Dynamex*) and AB 5 (Chapter 296, Statutes of 2019) in state law.  AB 2257 recasts the provisions of AB 5 and provides that, for specified occupations and relationships, the applicable test for determining if an individual is an employee or an independent contractor is the test set forth in the California Supreme Court decision in *S.G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal. 3d 341 (*Borello*) or relevant statute.").

1   and (3) the sought-after facts are essential to oppose summary judgment." *Midbrook Flowerbulbs*

2   *Holland B.V. v. Holland Am. Bulb Farms, Inc.*, 874 F.3d 604, 619-20 (9th Cir. 2017) (internal

3   quotations and citation omitted).  The decision whether to defer a summary judgment ruling to

4   allow for discovery is a matter within the Court's discretion.  *Tatum v. City & Cnty. of San*

5   *Francisco*, 441 F.3d 1090, 1100 (9th Cir. 2006).

6          Ms. Guynn-Neupane's counsel avers that plaintiff requires "additional written discovery

7   and deposition to oppose [defendants'] argument that [they are] 'data aggregator[s]' under AB

8   2257/California Labor Code section 2782."  Dkt. No. 54-1 ¶ 5; Dkt. No. 61-1 ¶ 5.  Counsel further

9   states that additional discovery is needed because the California Labor Code § 2782 "data

10  aggregator" exemption was enacted on September 4, 2020, and defendants' motions for summary

11  judgment, filed about a week later, are the first time that Ms. Guynn-Neupane was on notice of

12  their "data aggregator" defense.  Dkt. No. 54-1 ¶¶ 2-4, Ex. A; Dkt. No. 61-1 ¶¶ 2-4, Ex. A.

13  Additionally, counsel notes that Ms. Guynn-Neupane has been diligent in discovery, but that

14  discovery efforts focused on class certification issues.  Dkt. No. 54-1 ¶ 7; Dkt. No. 61-1 ¶ 7.  Ms.

15  Guynn-Neupane explained at oral argument that in order to be able to oppose the pending

16  summary judgment motions, she needs additional discovery regarding:  (1) other mock jurors, i.e.,

17  to determine whether Magna did or would have penalized other mock jurors if they refused to

18  answer focus group questions or to otherwise follow the focus group rules; (2) Magna's client

19  contracts to determine whether clients retain Magna to aggregate and summarize data, or whether

20  Magna is retained to analyze data; (3) the software used in connection with the electronic keypads

21  mock jurors use to respond to focus group questionnaires; as well as (4) "more information"

22  regarding the written report Magna ultimately provided to its AGC-012 client.  Dkt. No. 75 at 24-

23  25.

24         Ms. Guynn-Neupane does not identify the specific facts that further discovery would have

25  revealed, explain why such facts would be essential to justify her opposition, or indicate that

26  deferring the resolution of defendants' summary judgment motions until the additional discovery

27  has been taken would have allowed her to produce evidence creating a genuine issue of material

28  fact as to whether defendants qualify for the "data aggregator" exemption to the ABC test or

1   whether she properly is classified as an independent contractor or as an employee. Although the

2   law regarding the "data aggregator" exemption is relatively new, there is no indication in the

3   record that the nature of defendants' respective businesses have changed since AB 2257 was

4   passed. There is no dispute that all exhibits submitted in support of defendants' respective

5   summary judgment motions were produced to Ms. Guynn-Neupane in discovery. *See* Dkt. No.

6   63-1 ¶ 7; Dkt. No. 66-1 ¶ 7. Additionally, the record indicates that Ms. Guynn-Neupane has taken

7   extensive discovery about defendants' respective practices and procedures with respect to jury

8   focus groups generally, and the February 2019 focus group specifically. *See* Dkt. No. 63-1; Dkt.

9   No. 66-1. Therefore, the Court denies Ms. Guynn-Neupane's request to defer adjudication of the

10  pending summary judgment motions pursuant to Rule 56(d).

11      **B.      Statutory Purpose of California's Wage and Hour Legislation**

12          Whether Ms. Guynn-Neupane's independent contractor or employee status is evaluated

13  under *Borello* or the ABC test, the focus of the Court's analysis is the scope and purpose of the

14  legislation in question. *See Borello*, 48 Cal. 3d at 353-54 ("The nature of the work, and the overall

15  arrangement between the parties, must be examined to determine whether they come within the

16  history and fundamental purposes of the statute [at issue].") (internal quotations and citation

17  omitted); *see also Dynamex*, 4 Cal. 5th at 934 ("[A]lthough we have sometimes characterized

18  *Borello* as embodying the common law test or standard for distinguishing employees and

19  independent contractors, it appears more precise to describe *Borello* as calling for resolution of the

20  employee or independent contractor question by focusing on the intended scope and purposes of

21  the particular statutory provision or provisions at issue."). "'Each service arrangement must be

22  evaluated on its facts, and the dispositive circumstances may vary from case to case.'" *Dynamex*,

23  4 Cal. 5th at 932 (quoting *Borello*, 48 Cal. 3d at 354).

24          As noted above, Ms. Guynn-Neupane claims that defendants violated several California

25  wage and hour laws, as well as IWC Wage Order No. 4-2001. Dkt. No. 15. That IWC Wage

26  Order governs "professional, technical, clerical, mechanical and similar occupations," and defines

27  an "employee" as "any person employed by an employer," and further provides that "employ"

28  means to "engage, suffer, or permit to work." Cal. Code Regs. tit. 8 § 11040.

Wage orders are a type of remedial legislation that serve several purposes. *Dynamex*, 4 Cal. 5th at 952-53. One such objective is to ensure that workers "are provided at least the minimal wages and working conditions that are necessary to enable them to obtain a subsistence standard of living and to protect the workers' health and welfare." *Id.* at 952. While wage orders are primarily for the benefit of workers, they also are intended to benefit law-abiding business and "ensur[e] that such responsible companies are not hurt by unfair competition from competitor businesses that utilize substandard employment practices." *Id.* Finally, wage orders also benefit the public at large "because if the wage orders' obligations are not fulfilled the public will often be left to assume responsibility for the ill effects to workers and their families resulting from substandard wages or unhealthy and unsafe working conditions." *Id.* at 953.

Although California's wage-and-hour laws must be liberally construed in a manner that serves these remedial purposes, *see Dynamex*, 4 Cal. 5th at 953, the established analytical framework seems ill-suited to resolving the question of whether Ms. Guynn-Neupane, in her role as a mock juror in a jury research study, was an employee or independent contractor. As discussed below, the tests and principles usually considered in cases assessing employee or independent contractor status do not apply in a straightforward manner to the particular circumstances presented here. In essence, Ms. Guynn-Neupane is an individual who, while employed on a full-time basis elsewhere in an entirely unrelated occupation, voluntarily participated in a one-day research study administered by Magna. At the end of the research session, Ms. Guynn-Neupane's relationship with Magna ended and she was paid a lump sum.

For the reasons discussed below, to the extent Ms. Guynn-Neupane can be said to have had any sort of relationship with defendants, under both *Borello* and the ABC test the undisputed evidence establishes that she was, at most, an independent contractor and not an employee of either Magna or Wilkins. There is no genuine dispute that any controls imposed on the study or its participants were social science research tools designed to ensure the validity of the research results. Notably, after volunteering for the study, Ms. Guynn-Neupane at all times retained independent discretion and judgment with respect to her essential function as a mock juror, which simply was to provide her unvarnished personal views and opinions about the personal injury

United States District Court
Northern District of California

1    lawsuit that was the subject of the focus group.  Ms. Guynn-Neupane's arguments to the contrary

2    do not raise a genuine dispute of material fact sufficient to prevent summary judgment in

3    defendants' favor.

4    **C.      The "Data Aggregator" Exemption from the ABC Test**

5        The California Labor Code exempts "data aggregators" from application of the ABC test.

6    Cal. Labor Code § 2782.  A "data aggregator" is defined as "a business, research institution, or

7    organization that requests and gathers feedback on user interface, products, services, people,

8    concepts, ideas, offerings, or experiences from individuals willing to provide it."  *Id*.

9    § 2782(a)(2)(A).  The exemption applies under the following conditions:

> (A) The individual is free from control and direction from the data
> aggregator with respect to the substance and content of the feedback.
>
> (B) Any consideration paid for the feedback provided, if prorated to
> an hourly basis, is an amount equivalent to or greater than the
> minimum wage.
>
> (C) The nature of the feedback requested requires the individual
> providing feedback to the data aggregator to exercise independent
> judgment and discretion.
>
> (D) The individual has the ability to reject feedback requests, without
> being penalized in any form by the data aggregator.

18   *Id*. § 2782(a)(1)(A)-(D).  If all of these criteria are met, then the test set forth in *Borello* applies in

19   determining Ms. Guynn-Neupane's employee or independent contractor status.  *Id*. § 2782(a)(1).

20       Preliminarily, the parties dispute whether either Magna or Wilkins meets the statutory

21   definition of a "data aggregator."  Even if defendants do qualify as "data aggregators," the parties

22   disagree about whether each defendant satisfies all four requirements for application of the

23   exemption.  The parties have not cited, and this Court has not found, any cases interpreting the

24   "data aggregator" provision of the Labor Code.  To resolve this issue, the Court relies on

25   principles of statutory interpretation.

26       When interpreting a California statute, federal courts apply California's rules of statutory

27   construction.  *See Turnacliff v. Westly*, 546 F.3d 1113, 1117-18 (9th Cir. 2008).  The "'ultimate

28   task' in statutory interpretation 'is to ascertain the legislature's intent.'"  *Id*. at 1118 (quoting

*People v. Massie*, 19 Cal. 4th 550, 569 (1998)).  "[T]he key to statutory interpretation is applying the rules of statutory construction in their proper sequence."  *MacIsaac v. Waste Mgmt. Collection & Recycling, Inc*., 134 Cal. App. 4th 1076, 1082 (2005).

Courts "start with the statute's words, assigning them their usual and ordinary meanings, and construing them in context."  *Martinez v. Combs*, 49 Cal. 4th 35, 51 (2010); *see also Turnacliff*, 546 F.3d at 1118 ("Ordinarily, the words of the statute provide the most reliable indication of legislative intent.  Courts should give the language of the statute its usual, ordinary import and accord significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose.") (internal quotations and citations omitted).  "If the words themselves are not ambiguous," courts "presume the Legislature meant what it said, and the statute's plain meaning governs."  *Martinez*, 49 Cal. 4th at 51; *see also MacIsaac*, 134 Cal. App. 4th at 1083 ("If the statutory language is clear and unambiguous, our task is at an end, for there is no need for judicial construction.").  "Nevertheless, the 'plain meaning' rule does not prevent a court from determining whether the literal meaning of the statute comports with its purpose."  *MacIsaac*, 134 Cal. App. 4th at 1083.  "Thus, although the words used by the Legislature are the most useful guide to its intent, [courts] do not view the language of the statute in isolation."  *Id*.  Instead, courts "construe the words of the statute in context, keeping in mind the statutory purpose."  *Id*.  Courts do not follow the plain meaning of the statute when doing so would frustrate the manifest purposes of the legislation as a whole or lead to absurd results.  *Id*.

If the words of the statute are subject to more than one reasonable interpretation, courts "may look to such aids as the legislative history of the measure and maxims of statutory construction."  *Martinez*, 49 Cal. 4th at 51; *see also MacIsaac*, 134 Cal. App. 4th at 1083 (same).  "'In cases of uncertain meaning, we may also consider the consequences of a particular interpretation, including its impact on public policy.'"  *Martinez*, 49 Cal. 4th at 51 (quoting *Wells v. One2One Learning Found.,* 39 Cal. 4th 1164, 1190 (2006)); *see also MacIsaac*, 134 Cal. App. 4th at 1083 ("If ambiguity remains after resort to secondary rules of construction and to the statute's legislative history, then we must cautiously take the third and final step in the interpretive process.  In this phase of the process, we apply reason, practicality, and common sense to the

1   language at hand.  Where an uncertainty exists, we must consider the consequences that will flow

2   from a particular interpretation.") (internal quotations and citations omitted).

3         **1.     Whether defendants meet the statutory definition of "data aggregator"**

4               **a.     Magna**

5         Magna contends that when it conducts jury research focus groups, including the February

6   2019 focus group at issue, it is a "data aggregator" because in such proceedings it collects

7   quantitative and qualitative data from participants, which serves as the basis for its

8   recommendations to its clients.  *See* Dkt. No. 48-1 ¶¶ 10, 18; Dkt. No. 48-2 ¶¶ 11, 25, 35, 46, 73-

9   74.  Ms. Guynn-Neupane argues that Magna does not qualify as a "data aggregator" because the

10  scope of its business operations indisputably encompasses more than requesting and gathering

11  data for jury research focus groups.  *See* Dkt. No. 48-1 ¶ 7.  Further, she contends that even within

12  the jury consulting portion of Magna's business, Magna does not merely gather data.  Here, Ms.

13  Guynn-Neupane points out that the final product Magna presents to its clients is "a detailed work

14  product" that Magna says represents many hours of work by its trained consultants.  *See* Dkt. No.

15  62 at 16; Dkt. No. 64 at 5.  In sum, Ms. Guynn-Neupane contends that Magna is a data *analyst*,

16  not a data aggregator.  To qualify as a "data aggregator," she argues, Magna must be solely in the

17  business of "aggregating raw data."  Dkt. No. 62 at 15.

18        Section 2782 broadly defines a "data aggregator" as (1) "a business, research institution, or

19  organization" that (2) "requests and gathers feedback" (3) "on user interface, products, services,

20  people, concepts, ideas, offerings, or experiences" (4) "from individuals willing to provide it."

21  There is no dispute that Magna is a "business, research institution, or organization," and that

22  Magna "request[ed] and gather[ed] feedback" from mock jurors about matters that reasonably may

23  be characterized as "people, concepts, ideas, . . . or experiences."  It is also undisputed that Ms.

24  Guynn-Neupane willingly provided her feedback as a participant in the study.  *See* Dkt. No. 48-3

25  ¶ 11; 52-1 ¶ 11; Dkt. No. 54-3, Ex. C (Crabtree Dep. 56:19-57:15); Dkt. No. 61-3, Ex. C (Crabtree

26  Dep. 56:19-57:15).

27        Based on the plain language of the statute, Magna is a "data aggregator" when it conducts

28  jury research focus groups, including the AGC-012 study in which Ms. Gunn-Neupane

United States District Court
Northern District of California

participated.  Nothing in the language of the statute requires or even suggests that a "data aggregator" must be solely in the business of "aggregating raw data," as urged by Ms. Guynn-Neupane.  The Court declines to read such a limitation into the statute.  *See Soto v. Motel 6 Operating, L.P.*, 4 Cal. App. 5th 385, 393 (2016) ("The rules of statutory construction provide that [u]nder the guise of construction, a court should not rewrite the law, add to it what has been omitted, omit from it what has been inserted, give it an effect beyond that gathered from the plain and direct import of the terms used, or read into it an exception, qualification, or modification that will nullify a clear provision or materially affect its operation so as to make it conform to a presumed intention not expressed or otherwise apparent in the law.") (internal quotations and citation omitted); *Yeager v. Blue Cross of Cal.*, 175 Cal. App. 4th 1098, 1103 (2009) ("The Legislature's refusal to dictate the amount of coverage and its cost is not ambiguity—it is silence. We may not make a silent statute speak by inserting language the Legislature did not put in the legislation.").  Ms. Guynn-Neupane contends that construing the statutory definition of "data aggregator" broadly to include companies like Magna, will allow "any company that collects data in the course and scope of its otherwise complex business operations [to] similarly claim a data aggregator exemption to escape the ABC test."  Dkt. No. 62 at 16.  That argument, however, ignores that a company must still satisfy the four statutory criteria before the exemption will be applied.  Satisfying the statutory definition of "data aggregator" is necessary, but not sufficient, to trigger the exemption.

> Accordingly, Magna meets the definition of a "data aggregator."

### b.     Wilkins

> As a prefatory matter, Wilkins contends that the entire framework of the discussion regarding Ms. Guynn-Neupane's employee or independent contractor status is irrelevant to Wilkins and its role as a recruiter for the AGC-012 jury focus group.  Here, Wilkins argues Ms. Guynn-Neupane provided no service or benefit to the company such that she could even be considered an independent contractor, much less an employee.  Even assuming she did provide some benefit or service to Wilkins, Wilkins argues that it is a "data aggregator" to the extent Magna also is a "data aggregator" by virtue of Ms. Guynn-Neupane's joint employer theory (Dkt.

United States District Court
Northern District of California

No. 15 ¶ 8).

In her opposition brief, Ms. Guynn-Neupane does not directly refute Wilkins's argument that it derived no benefit or service from her. *See* Dkt. No. 61 at 14-16. When pressed on that issue at oral argument, she confirmed that her primary theory of liability is based on defendants' alleged status as joint employers. Dkt. No. 75 at 14; *see also* Dkt. No. 15 ¶ 8. Wilkins maintains that Ms. Guynn-Neupane has not presented evidence establishing liability on that basis.

In the context of determining which of various entities could be considered joint employers, the California Supreme Court has described three alternative tests to determine whether an employment relationship exists. *See Martinez*, 49 Cal. 4th at 64. In that context, *Martinez* held that to "employ" means (1) "to exercise control over the wages, hours, or working conditions"; (2) "to suffer or permit to work"; or (3) "to engage, thereby creating a common law relationship." *Id*. Ms. Guynn-Neupane has not articulated how or why any of Wilkins's conduct would satisfy any of these tests. The undisputed evidence demonstrates that, other than posting the ad for the research study and sending a few follow-up communications, Wilkins's role was limited to reading the screener script prepared by Magna to gather demographic and other data from individuals who expressed an interest in participating in the AGC-012 study. Dkt. No. 52-1 ¶¶ 6-7, 9, 10, 23; Dkt. No. 52-3 ¶ 14, Ex. 1; Dkt. No. 61-3, Ex. C (Crabtree Dep. 53:7-21, 56:19-58:17, 66:2-20, Ex. 2); Dkt. No. 61-3, Ex. D (Calzaretta Dep. 96:3-20). There is no indication that Wilkins had any part in deciding (or that it even had the authority to decide) when and how the study would be conducted, who would participate in the study, or how much participants would be paid. On this record, the Court finds no basis to conclude that Wilkins's business relationship with Magna, standing alone, provides a sufficient basis for liability. *See Martinez*, 49 Cal. 4th at 70 (concluding that the parties' "business relationship, standing alone, d[id] not transform the purchaser into the employer of the supplier's workforce" where neither one of the purchasers had the power to prevent the plaintiffs from working).

Ms. Guynn-Neupane argued at the motion hearing, as she does elsewhere in her opposition brief, that Wilkins essentially functioned as a "temporary services employer" under Labor Code § 201.3, and she therefore provided a service to Wilkins "in the same aspect that a temp agency

United States District Court
Northern District of California

gets service from temporary employees by having them fulfill the roles they are assigning[.]"  *See* Dkt. No. 75 at 15; *see also* Dkt. No. 61 at 27 n.2.  While Ms. Guynn-Neupane argues that Wilkins is similar to a temporary staffing agency in several respects, she has not demonstrated that Wilkins meets all the elements for a "temporary services employer" within the meaning of that statute,[15] or that Wilkins's liability properly may be premised on her belief that "Wilkins was no different than a staffing agency."  Dkt. No. 61 at 27.

In any event, insofar as Ms. Guynn-Neupane can be said to have had any sort of relationship with Wilkins, the Court finds that Wilkins also is a "data aggregator" under the plain language of Labor Code § 2782.  Wilkins indisputably is "a business, research institution, or organization."  In recruiting Ms. Guynn-Neupane for the jury focus group, Wilkins sought information about her personal background, including her education and employment experience.

---

[15] California Labor Code § 201.3 provides, in relevant part:

> (1) "Temporary services employer" means an employing unit that contracts with clients or customers to supply workers to perform services for the clients or customers and that performs all of the following functions:
>
> (A) Negotiates with clients and customers for matters such as the time and place where the services are to be provided, the type of work, the working conditions, and the quality and price of the services.
>
> (B) Determines assignments or reassignments of workers, even if workers retain the right to refuse specific assignments.
>
> (C) Retains the authority to assign or reassign a worker to another client or customer when the worker is determined unacceptable by a specific client or customer.
>
> (D) Assigns or reassigns workers to perform services for clients or customers.
>
> (E) Sets the rate of pay of workers, whether or not through negotiation.
>
> (F) Pays workers from its own account or accounts.
>
> (G) Retains the right to hire and terminate workers.

Cal. Labor Code § 201.3(a)(1).

United States District Court
Northern District of California

*See* Dkt. No. 61-3, Ex. C (Crabtree Dep., Ex. 2).  Ms. Guynn-Neupane offers no persuasive argument as to why such activity does not constitute "request[ing] and gather[ing] feedback on . . . people . . . or experiences" as stated in § 2782.  Ms. Guynn-Neupane voluntarily responded to the research study ad, indicating her willingness to provide information for the research study.

Ms. Guynn-Neupane argues that Wilkins cannot be a "data aggregator" for two reasons: (1) the feedback Ms. Guynn-Neupane provided as a mock juror was provided only to Magna, not Wilkins; and (2) Wilkins's mock juror recruiting activities comprise only a fraction (11%) of Wilkins's overall business operations.  Dkt. No. 61-3, Ex. C (Crabtree Dep. at 35:2-7, 74:12-75:14).  The statute, however, does not state or suggest that the "data aggregator" definition is limited to "a business, research institution, or organization" that gathers information directly for itself, as opposed to indirectly for use by others.[16]  Nor does the statute require that "request[ing] and gather[ing] feedback" must comprise a particular percentage of the total business operations of the "data aggregator."  As explained above, the Court will not construe the statutory definition of "data aggregator" to include limitations that are not expressed in the plain language of the statute.  *See Soto*, 4 Cal. App. 5th at 393; *Yeager*, 175 Cal. App. 4th at 1103.  To the extent Ms. Guynn-Neupane reiterates arguments that construing the statutory definition of "data aggregator" to include companies like Wilkins will allow "any company that collects data in the course and scope of its otherwise complex business operations [to] similarly claim a data aggregator exemption to escape the ABC test" (Dkt. No. 61 at 16), those arguments are rejected for the reasons stated above with respect to Magna.

### 2.    Whether the "data aggregator" exemption applies

The "data aggregator" exemption applies only if Magna and Wilkins establish all of the following conditions with respect to Ms. Guynn-Neupane:

> (A) The individual is free from control and direction from the data aggregator with respect to the substance and content of the feedback.

---

[16] Even if the language of § 2782 were ambiguous, legislative history materials indicate that the statutory definition of "data aggregator" is "intended to be inclusive of an entity that requests and gathers feedback either directly or for the benefit of third parties."  Cal. Assemb. Jour., 2019-2020 Reg. Sess., No. 218 at 148.

United States District Court
Northern District of California

(B) Any consideration paid for the feedback provided, if prorated to an hourly basis, is an amount equivalent to or greater than the minimum wage.

(C) The nature of the feedback requested requires the individual providing feedback to the data aggregator to exercise independent judgment and discretion.

(D) The individual has the ability to reject feedback requests, without being penalized in any form by the data aggregator.

Cal. Labor Code § 2782(a)(1)(A)-(D).

### a.      Magna

With respect to Magna, Ms. Guynn-Neupane does not dispute that elements (B) and (C) are satisfied.  Magna says that the focus group lasted for approximately 9 hours, and there is no dispute that Ms. Guynn-Neupane was paid $260 (including $10 for parking).  Dkt. No. 48-2 ¶ 69.  The portion of Magna's payment for Ms. Guynn-Neupane's time, prorated to an hourly basis, is $27.78/hour, well above California's minimum wage rate as of the AGC-012 focus group.[17]  Additionally, Ms. Guynn-Neupane does not dispute that the nature of the feedback requested by Magna required her to exercise independent judgment and discretion.

The parties disagree about whether Magna has met elements (A) and (D).  Element (A) requires Magna to show that Ms. Guynn-Neupane "is free from control and direction from the data aggregator with respect to the substance and content of the feedback."  Cal. Labor Code § 2782(a)(1)(A).  Ms. Guynn-Neupane argues that Magna cannot satisfy this requirement because Magna prohibited mock jurors from conducting any outside research or using outside data in responding to the questionnaires administered during the focus group.  *See* Dkt. No. 54-3, Ex. F

---

[17] Section 2782 defines "minimum wage" to mean "local or state minimum wage, whichever is greater."  Cal. Labor Code § 2782(a)(2)(B).  There is no indication that Monterey County or any of its cities have adopted minimum wage ordinances that are higher than the California minimum wage.  *See* https://www.dir.ca.gov/dlse/faq_minimumwage.htm (indicating that as of January 1, 2019, the minimum wage rate was $11/hour for employers with no more than 25 employees and $12/hour for employers with 26 or more employees) (last accessed September 30, 2021).  Magna's payment to Ms. Guynn-Neupane also exceeds California's current minimum wage rates.  *See id.* (indicating that as of January 1, 2021, the minimum wage rate is $13/hour for employers with no more than 25 employees and $14/hour for employers with 26 or more employees).

1    (Janke Dep. at 88:24-89:25).  Additionally, mock jurors were permitted to respond to Magna's

2    questionnaires using only the hand-held electronic keypads with a pre-set scale of 1 to 3,

3    corresponding to responses such as "helpful," "neutral," and "not helpful."  Dkt. No. 48-2 ¶ 41;

4    Dkt. No. 54-3, Ex. E (Calzaretta Dep. at 215:6-20), Ex. F (Janke Dep. at 79:11-80:24, 88:24-

5    89:25, 93:12-21).  Magna does not dispute that it set certain parameters for mock jurors' responses

6    to the questionnaires that were administered, but it maintains that those conditions are social

7    science research techniques that are used to facilitate the collection and analysis of the data that is

8    obtained and to simulate, as feasible, the same conditions that would exist in an actual jury trial.

9    *See* Dkt. No. 48-1 ¶¶ 11, 17-19, Dkt. No. 48-2 ¶¶ 30, 34-35, 41, 43, 48, 49.

10        Indeed, the purpose of the AGC-012 study was to obtain mock jurors' personal opinions

11   about various aspects of the underlying tort litigation to help Magna's client evaluate the

12   effectiveness of trial themes and its overall litigation strategy in preparation for trial.  *See* Dkt. No.

13   48-2 ¶ 8; Dkt. No. 48-4, Ex. 1 (Guynn-Neupane Dep. 49:8-15) (acknowledging that Magna "just

14   wanted our—they wanted an opinion from what potentially the direction of this—if it's to go to

15   trial, what the outcome of the case would be.  It was a study.  It was opinions.  And that was, that

16   was the reason that we were brought in.").  As Ms. Guynn-Neupane acknowledged in deposition,

17   in this context, there is no "right" or "wrong" answer to Magna's questions, "[b]ecause it was all

18   individual opinion."  *See* Dkt. No. 48-4 ¶ 2, Ex. 1 (Guynn-Neupane Dep. 88:3-7).  Instead, it is the

19   jurors' opinions themselves—i.e., the "substance and content of the feedback"—that hold value

20   for Magna.  Magna did set certain criteria and conditions for jurors to provide their responses, but

21   the evidence does not demonstrate that Magna controlled or directed the mock jurors' actual

22   opinions.  This is entirely in keeping with Magna's stated social science research goal of obtaining

23   results that simulated, as closely as possible, an actual jury trial so as to provide its client with

24   reliable insights into jurors' decision-making process and the strengths and weaknesses of its case.

25   While the jurors were required to respond to Magna's questionnaires using hand-held keypads

26   with preset responses, the pre-set responses appeared to cover the field of relevant responses, and

27   Ms. Guynn-Neupane explained in deposition that with the keypad jurors "were able to decide for

28   [them]selves what answer [they] were going to choose based on [their] individual opinion."  *Id.*

United States District Court
Northern District of California

1    (Guynn-Neupane Dep. 60:25-61:3.)  As noted above, Ms. Guynn-Neupane has not offered any

2    evidence or argument raising a genuine dispute about the nature of the feedback requested by

3    Magna.  For these reasons, the Court concludes that Magna satisfies element (A) of the "data

4    aggregator" exemption because it did not control or direct the substance or content of the feedback

5    requested from Ms. Guynn-Neupane.

6            As for element (D), Magna must show that "[t]he individual has the ability to reject

7    feedback requests, without being penalized in any form by the data aggregator."  Cal. Labor Code

8    § 2782(a)(1)(D).  Magna contends that element (D), properly understood, simply means that an

9    individual is free to decline to participate in a study without being penalized, for example, by

10   being paid reduced compensation for future studies or being prohibited from participation in

11   another study.  Magna argues that it satisfies element (D) because Ms. Guynn-Neupane

12   indisputably was free to decline to participate in the mock juror study without any adverse

13   consequence.  Dkt. No. 48-3 ¶ 11.  Indeed, Magna says that it never would have known if she had

14   declined to participate in the study at all.

15           Ms. Guynn-Neupane argues that Magna's interpretation of element (D) focuses too

16   narrowly on the recruiting period before any purported independent contractor relationship was

17   established.  She maintains that element (D) more broadly requires Magna to show that mock

18   jurors who agreed to participate in the study nonetheless remained free to either leave the study

19   altogether or to refuse to provide feedback during the study, without any form of penalty.  Ms.

20   Guynn-Neupane contends that, at a minimum, the evidence raises a genuine fact dispute about

21   whether the mock jurors had that ability.  Among other things, she points out that payment of the

22   full $260 was made on the condition that jurors "show up on time and participate until the end of

23   the session" and that jurors who chose to leave the research session would not be paid.  *See* Dkt.

24   No. 54-3, Ex. D (Calzaretta Dep., Ex. 15 at MLS000048); Dkt. No. 54-3, Ex. C (Crabtree Dep.

25   64:25-65:12; 66:2-20; Ex. 2).

26           The fact that Ms. Guynn-Neupane was free to accept or decline the invitation to participate

27   in the AGC-012 study is of no particular moment, insofar as the statutory definition of "data

28   aggregator" presupposes "individuals willing to provide" their "feedback" to the data aggregator.

Cal. Labor Code § 2782(a)(2)(A).  However, to the extent Ms. Guynn-Neupane contends that

Magna can satisfy element (D) only if mock jurors may leave or withdraw from the study, but still

be fully paid, such an interpretation is inconsistent with the statutory purpose of § 2782.  As noted

above, the fundamental purpose of AB 2257 is to clarify that for certain specified occupations and

relationships, such as that between a "data aggregator" and an "individual providing feedback,"

the ABC test does not apply; instead, *Borello* states the applicable test for determining if an

individual is an employee or an independent contractor.  *See* Cal. Assemb. Jour., 2019-2020 Reg.

Sess., No. 218 at 147.  Ms. Guynn-Neupane's construction of element (D) would lead to an absurd

result; and this Court finds no basis to conclude, as Ms. Guynn-Neupane seems to suggest, that the

Legislature intended to establish an exemption to the ABC test based on an individual's ability to

accept a paid assignment, but then decline to perform the assignment and still be paid.  *See*

*Lawson v. Grubhub, Inc.*, 302 F. Supp. 3d 1071, 1085 (N.D. Cal. 2018) ("Even an independent

contractor must perform the work he contracted to perform."), *reversed and remanded on other*

*grounds in Lawson v. Grubhub, Inc.*, — F. 4th —, No. 18-15386, 2021 WL 4258826 (9th Cir.

Sept. 20, 2021).

In any event, the Court need not decide whether Ms. Guynn-Neupane correctly argues that

element (D) requires Magna to show that mock jurors had "the ability to reject feedback requests"

during the study "without being penalized in any form by the data aggregator."  The unrefuted

evidence indicates that, consistent with its stated social science research goals, Magna not only did

not penalize non-responsive jurors, it valued non-responsiveness as an indicator of whether mock

jurors were engaged or disinterested in the mock trial presentations.  As Mark Calzaretta, Magna's

Vice President of Litigation Consulting, avers:

> What Magna cares about is how participants think or feel
> and there are no right or wrong answers.  Research participants are
> not evaluated based on their level of engagement.  Participants are
> merely asked to observe the presentations and provide their
> feedback based on their own opinions and beliefs.
>
> Magna does not penalize research participants, such as
> reduced compensation, for not engaging in the study in a particular
> manner.  Participants are free to listen or not listen, answer questions
> or not, and actively engage in discussions or not without
> consequence.  Just like a real trial where there are disengaged jurors,

a disengaged participant also offers important data.

Dkt. No. 48-1 ¶¶ 19-20.  This sentiment is also reflected in Mr. Calzaretta's deposition testimony

explaining how Magna uses the hand-held keypad for questionnaires:

> [Mock jurors] don't have to press their buttons because if they are
> not engaged, it's as important as if someone is engaged.  It's a data
> point. . . .
> Again, we are setting up the social experiment so that we can collect
> the data one way or another.· And we might find that [for] the
> plaintiff they're very engaged and then they're disengaged and
> weren't hitting the keypads at all during the defense presentation.·
> That's an important trigger point for us.

Dkt. No. 54-3, Ex. E (Calzaretta Dep. 215:22-25, 216:3-8).  Similarly, Ms. Janke confirmed that

during the mock deliberation portion of the study, "[i]t was up to the participants in Deliberation

Group C, including [Ms. Guynn-Neupane], to determine how much they wanted to participate in

the deliberations.  They could be as vocal or inactive as they choose to be during this session, just

like actual jurors who are deliberating at trials."  Dkt. No. 48-2 ¶ 61.  Mr. Calzaretta noted that

while Magna generally asks participants to respond to the questions, mock jurors will sometimes

not respond because they are not "computer savvy or even capable of pressing a keypad," in which

case Magna does not "call them out" and will move on without requiring a response.  Dkt. No. 63-

1, Ex. 4 (Calzaretta Dep. 255:3-23).

    While Ms. Guynn-Neupane contends that the evidence raises a genuine fact dispute about

whether mock jurors had the ability to reject feedback requests during the study without any

penalty, most of the evidence she cites concerns the particular study parameters and guidelines

Magna set.  And although she points to some evidence indicating that Magna asked jurors to

respond to questions, and waited for everyone to respond before moving to the next question, she

does not claim that she or any other mock juror were forced to answer any questions or were

penalized for refusing to do so. *See* Dkt. No. 54-3, Ex. B (Guynn-Neupane Dep. 57:24-59:21); Ex.

D (Calzaretta Dep., Ex. 15 at MLS000048); Ex. E (Calzaretta Dep. 214:6-24, 215:6-20, 216:22-

217:10, 254:19-255:23, 219:21-221:16); Ex. F (Janke Dep. 74:5-25, 78:11-23, 79:11-80:24, 90:16-

91:3, 98:23-99:2; Ex. 13).  Ms. Guynn-Neupane also argues that a video clip of the mock jurors'

deliberations shows that Magna prohibited them from taking a break, when a Magna consultant

31

"pushe[d] the mock jurors back into the room and require[d] that they continue to deliberate." Dkt. No. 62 at 18; Dkt. No. 51-5, Ex. 27.  The video indicates that on one occasion the consultant asked the mock jurors to delay their restroom break while they continued to discuss a particular topic.  However, the video evidence does not support Ms. Guynn-Neupane's claim that Magna generally controlled the timing and duration of restroom breaks, as the video shows that individuals were permitted to take a restroom break at any time.  None of the evidence cited by Ms. Guynn-Neupane indicates that Magna penalized any juror for failing to respond to questions or to actively participate in mock deliberations.

For these reasons, Magna has demonstrated that it meets all the requirements of the "data aggregator" exemption, and that *Borello* therefore applies to the determination Ms. Guynn-Neupane's employee or independent contractor status.

### b.     Wilkins

The parties dispute whether Wilkins automatically qualifies for the "data aggregator" exemption by virtue of Ms. Guynn-Neupane's joint employer theory of liability.  As discussed above, Wilkins meets the definition of a "data aggregator" within the meaning of § 2782.

The parties nonetheless disagree about whether Wilkins satisfies element (B) of the data aggregator exemption in view of the fact that only Magna, not Wilkins, paid Ms. Guynn-Neupane for the mock jury session.  Element (B), however, does not appear to require a "data aggregator" to pay compensation for an individual's feedback.  The plain language of the statute simply requires that "*[a]ny consideration paid for the feedback,*" prorated to an hourly rate, must meet or exceed the minimum wage.  Cal. Labor Code § 2782(a)(1)(B) (emphasis added).  For the reasons discussed above, Magna's payment to Ms. Guynn-Neupane indisputably was well over California's minimum wage at the time of the AGC-012 study.

As for the remaining elements of the exemption, Ms. Guynn-Neupane incorporates by reference the same arguments she made in her opposition to Magna's summary judgment motion. Dkt. No. 61 at 16.  Thus, she does not dispute that Wilkins meets element (C), i.e., "[t]he nature of the feedback requested requires the individual providing feedback to the data aggregator to exercise independent judgment and discretion."  With respect to element (A), the undisputed

evidence demonstrates that Ms. Guynn-Neupane was "free from control and direction from [Wilkins] with respect to the substance and content of the feedback." Indeed, Wilkins simply read the screener script provided by Magna to gather demographic and other background data from Ms. Guynn-Neupane. *See* Dkt. No. 61-3, Ex. C (Crabtree Dep. 57:24-58:5; 66:2-20, Ex. 2). There is no indication that Wilkins in any way controlled or dictated Ms. Guynn-Neupane's responses to those questions or any of the questions posed by Magna during the study itself. As for element (D), Wilkins's unrefuted evidence is that participation in the focus group was voluntary, and Ms. Guynn-Neupane could have declined the invitation to participate in the research study, without any consequence. Dkt. No. 52-1 ¶ 11. In any event, there is no evidence that Wilkins had any authority to impose any sort of penalty on research participants.

For these reasons, Wilkins satisfies the requirements for application of the "data aggregator" exemption to the ABC test. *Borello* therefore applies to determine Ms. Guynn-Neupane's employee or independent contractor status with respect to Wilkins.

### D.     The *Borello* Test

In determining whether a person is an independent contractor or employee, the "principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired[.]" *Borello*, 48 Cal. 3d at 350 (internal quotations and citations omitted). Courts also consider secondary indicia, including "the right to discharge at will, without cause," and the following additional factors:

> (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

*Id*. at 350-51. "The label placed by the parties on their relationship is not dispositive, and subterfuges are not countenanced." *Id*. at 349. Additionally, the *Borello* factors "cannot be

33

applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations." *Id*. at 351 (internal quotations and citation omitted).  Assuming Ms. Guynn-Neupane provided services to defendants, no one disputes that Magna and Wilkins bear the burden of establishing that she was an independent contractor rather than an employee.  *See id.* at 349; *see also Hennighan v. Insphere Ins. Solutions, Inc.*, 38 F. Supp. 3d 1083, 1097 (N.D. Cal. 2014).

### 1.   Magna

#### a.   Right to Control

The principal question is whether Magna had "the right to control the manner and means of accomplishing the result desired[.]"  *Borello*, 48 Cal. 3d at 350 (internal quotations and citations omitted).  "Significantly, what matters under the common law is not how much control a hirer *exercises*, but how much control the hirer retains the *right* to exercise" and "whether the hirer 'retains all *necessary* control' over its operations."  *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522, 531, 533 (2014) (quoting *Borello*, 48 Cal. 3d at 357).

"'An independent contractor is one who renders service in the course of an independent employment or occupation, following his employer's desires only in the results of the work, and not the means whereby it is to be accomplished.'"  *Hennighan*, 38 F. Supp. 3d at 1098 (quoting *Varisco v. Gateway Sci. & Eng'g, Inc.*, 166 Cal. App. 4th 1099, 1103 (2008)).  "'On the other hand, the relationship of master and servant or employer and employee exists whenever the employer retains the right to direct how the work shall be done as well as the result to be accomplished.'"  *Id*. (quoting *Varisco*, 166 Cal. App. 4th at 1103).  "'But this rule requires that the right to exercise complete or authoritative control, rather than mere suggestion as to detail, must be shown.'"  *Id*. (quoting *Varisco*, 166 Cal. App. 4th at 1103).  "Generally, where an employer is more concerned with the quality of the result rather than the manner in which the work is done, that is evidence of an independent-contractor relationship."  *Id*. (citing *Missions Ins. Co. v. Workers' Comp. Appeals Bd.*, 123 Cal. App. 3d 211, 224 (1981)).  "'[T]he fact that a certain amount of freedom of action is inherent in the nature of the work does not change the character of the employment where the employer has general supervision and control over it.'"  *Id*. (quoting

United States District Court
Northern District of California

1    *Toyota Motor Sales U.S.A., Inc. v. Super. Ct.*, 220 Cal. App. 3d 864, 875 (1990)).

2           There is no question that Magna established certain parameters for the administration of

3    the AGC-012 focus group.  At issue is whether those study parameters relate to the quality of the

4    desired result (consistent with an independent contractor relationship), or whether they

5    demonstrate control over the manner and means of achieving the desired result (indicative of an

6    employer-employee relationship).  Ms. Guynn-Neupane argues that the undisputed facts show that

7    Magna exercised significant control over many aspects of the focus group, including both the

8    manner in which the mock jurors provided their views and opinions and the means by which they

9    did so.  Here again, she reiterates that mock jurors were asked not to use their cellphones and to

10   silence or turn their phones off; were instructed not to conduct any outside research; were told not

11   to discuss the case with other participants until juror deliberations began; were asked not to talk

12   during presentations and to hear all of the evidence and arguments presented by each side in order

13   to deliberate; were instructed to use the electronic hand-held keypads to respond to Magna's

14   questions using  pre-set responses; and were asked to stay on site for the duration of the focus

15   group, including during lunch and rest breaks, all of which were scheduled by Magna.  Dkt. No.

16   48-2 ¶ 38, 41; Dkt. No. 48-4 ¶ 3, Ex. 1 (Guynn-Neupane Dep. 52:18-20; 53:3-5); Dkt. No. 54-3,

17   Ex. B (Guynn-Neupane Dep. 50:19-51:4, 57:24-59:21), Dkt. No. 54-3, Ex. E (Calzaretta Dep.

18   214:6-24, 215:6-20); Dkt. No. 54-3, Ex. F (Janke Dep. 72:25-76:9, 79:11-80:24, 88:24-89:25,

19   93:12-21, 97:7-19, Ex. 13)  As other indicia of control, Ms. Guynn-Neupane also points out that:

20        •  Magna repeated its instructions throughout the day-long session, including during

21          orientation and before each of the four breaks.  Dkt. No. 54-3, Ex. F (Janke Dep.

22          89:19-25, 96:7-22, 97:7-19, Ex. 13)

23        •  Pursuant to the NDA mock jurors were required to sign, mock jurors were not

24          permitted to take any photographs or to otherwise record the session.  Dkt. No. 54-

25          3, Ex. D (Calzaretta Dep. 177:2-178:14; Ex. 24).

26        •  Magna observed the mock deliberations; and, at one point, a Magna consultant

27          urged jurors to continue to deliberate when they attempted to take a break.

28          Individuals were permitted, however, to take a restroom break at any time.  Dkt.

No. 51-5, Ex. 27.

- During the post-verdict moderated discussions, mock jurors were not free to "engage in any sort of discussion," but were given direction on what topics to discuss. Dkt. No. 62 at 21; Dkt. No. 54-3, Ex. E (Calzaretta Dep. 228:14-230:18; Ex. F (Janke Dep. 117:18-120:13). For example, during the post-verdict discussions, Magna might ask for jurors' opinions and thoughts about the overall strengths and weaknesses of each side's case; any questions the mock jurors might have; and for any information the mock jurors would like from either side in order to help an actual jury make an informed decision about the case. Dkt. No. 54-3, Ex. F (Janke Dep. 119:18-120:4).

For present purposes, Magna does not dispute Ms. Guynn-Neupane's recital of the various rules and requirements for the study, but it contends that any control it exercised in the administration of the focus group related only to achieving the desired result of obtaining accurate and representative research data. Here, Magna says that all of the study parameters it implemented, such as the focus group schedule and breaks, the use of keypads, questionnaires and response options, and discussion topics are social science research techniques designed to ensure the reliability of Ms. Guynn-Neupane's and other mock jurors' feedback. Magna contends that at no time did it control the mock jurors' actual opinions, thoughts, and beliefs about the underlying personal injury litigation. For example, Magna says that:

- To avoid preconditioning, the research participants are not asked to do anything to prepare for the session and are not told until they arrive at the focus group that they would be taking part in jury research. Dkt. No. 48-1 ¶ 15.
- Keypads are used for the collection of quantitative data (such as participants' opinions about who is at fault and the amount of damages they would award) and linked to software that allows Magna to organize the data in different ways for its analyses. Dkt. No. 48-1 ¶ 18; Dkt. No. 48-2 ¶¶ 30-35, 41-50, Ex. 5 at MLS000644-671.
- The moderated post-verdict discussions are designed to gather qualitative data, e.g.

1    mock jurors' feedback during open discussions on specific topics, which were

2    recorded and used by Magna in preparing its analysis for its client.  Dkt. No. 48-1

3    ¶ 18; Dkt. No. 48-2 ¶¶ 66-68.

4    According to Magna, the study parameters do not indicate an employer-employee relationship in

5    any way because Magna says that ultimately what it "cares about is how participants think or

6    feel," "there are no right or wrong answers," and participants are not evaluated on their

7    performance or level of engagement.  Dkt. No. 48-1 ¶¶ 19-20; Dkt. No. 48-2 ¶¶ 20, 30, 41, 48-49,

8    61, 67; *see also* Dkt. No. 54-3, Ex. E (Calzaretta Dep. 215:22-25, 216:3-8).

9        In the present case, the quality of the desired result cannot be divorced entirely from the

10   manner and means by which that result is achieved, and there can be no serious dispute that in

11   administering the mock trial study, Magna has the right to control both the manner and means by

12   which the mock jurors received the study stimuli and were prompted to deliver their responses.  In

13   other contexts, this type of control might suggest an employer-employee relationship.  *See*

14   *generally, e.g., Alexander v. FedEx Group Package Sys., Inc.*, 765 F.3d 981, 989-90 (9th Cir.

15   2014) (finding that the control factor strongly favored the plaintiffs where the defendant's

16   "policies and procedures unambiguously allow [the defendant] to exercise a great deal of control

17   over the manner in which [plaintiffs] do their jobs," including personal "fashion choices and

18   grooming.")  As noted above, however, the *Borello* factors cannot be applied mechanically, and

19   "the 'control' test, applied rigidly and in isolation, is often of little use in evaluating the infinite

20   variety of service arrangements."  *Borello*, 48 Cal. 3d at 350.  Instead, Magna's right to control

21   must be considered in light of the particular facts of this case and the fundamental nature of Ms.

22   Guynn-Neupane's role as a mock juror.  *See id*. at 354 ("Each service arrangement must be

23   evaluated on its facts, and the dispositive circumstances may vary from case to case.").

24       Magna did not control the manner and means by which the mock jurors performed their

25   essential role, which was formulating their own opinions.  This role necessarily depended on the

26   mock jurors exercising independent judgment free from any direction or control by Magna over

27   the substance of their opinions.  Ms. Guynn-Neupane's sole function during the one-day AGC-012

28   focus group simply was to provide Magna with her feedback, i.e., her views and opinions about

United States District Court
Northern District of California

United States District Court
Northern District of California

the underlying personal injury litigation.  Just as the "data aggregator" exemption focuses on control over the "substance and content" of Ms. Guynn-Neupane's feedback itself, here too the desired result of obtaining accurate research data concerns only the substance and content of her feedback.  In concluding that Magna qualifies for the "data aggregator" exemption, the Court found that Magna did not control either the substance or content of Ms. Guynn-Neupane's views and opinions.  Indeed, Ms. Guynn-Neupane does not dispute that the nature of the feedback Magna sought required her to exercise independent judgment and discretion.  With respect to the common law "right to control" factor under *Borello*, the undisputed evidence of record demonstrates that Magna's desired result is to obtain accurate and representative feedback from Ms. Guynn-Neupane based on her own opinions, as free as possible from improper outside influences.  Magna was retained by its client to evaluate the effectiveness of the client's trial themes and to help refine the client's overall litigation strategy in preparation for trial.  Dkt. No. 48-2 ¶ 8.  And Magna convened the jury focus group and implemented the study parameters to simulate, to the extent feasible, the same conditions that would exist in an actual jury trial.  *See* Dkt. No. 48-1 ¶¶ 11, 17-19, Dkt. No. 48-2 ¶¶ 30, 34-35, 41, 43, 48, 49, 61.  Critically, the undisputed evidence demonstrates that Magna does *not* control the mock jurors' independent judgment and discretion in providing their views and opinions, which was the jurors' sole function in the study.

Viewed in this context, the Court does not find Magna's study parameters to be indicative of an employer-employee relationship, even though they demonstrate Magna's control over the manner and means by which the mock jurors delivered their views and opinions.  "When one person is performing work in which another is beneficially interested, the latter is permitted to exercise a certain measure of control for a definite and restricted purpose without incurring the responsibilities or acquiring the immunities of a master, with respect to the person controlled." *Millsap v. Fed. Express Corp.*, 227 Cal. App. 3d 425, 432 (1991) (internal quotations and citation omitted).  "Even one who is interested primarily in the result to be accomplished by certain work is ordinarily permitted to retain some interest in the manner in which the work is done without rendering himself subject to the peculiar liabilities which are imposed by law upon an employer."

*Id.*

Ms. Guynn-Neupane challenges Magna's claim that the study parameters were intended to simulate an actual jury trial. Here, she points out that pursuant to the NDA mock jurors were required to sign, they remained obliged—even beyond the research session itself—not to disclose to third parties any confidential information or trade secrets. *See* Dkt. No. 54-3, Ex. D (Calzaretta Dep., Ex. 24). Noting that Magna acknowledged in deposition that it is not aware of any instances where actual jurors signed confidentiality or nondisclosure agreements (Dkt. No. 54-3, Ex. F (Janke Dep. 121:22-123:7), Ms. Guynn-Neupane argues that Magna's NDA is not simply a research tool meant to simulate an actual jury experience. Instead, she seems to suggest that the NDA is indicative of the kind of control only an employer would wield. *See* Dkt. No. 62 at 20-21. Ms. Guynn-Neupane, however, has cited no authority suggesting that confidentiality agreements necessarily are a hallmark of an employment relationship, as opposed to an independent contractor relationship. In any event, there is no evidence suggesting that the terms of the NDA concerning the AGC-012 focus group had the effect of controlling the mock jurors' independent judgment or discretion in providing their opinions.

For these reasons, the principal "right to control" factor weighs in favor of an independent contractor relationship.

### b.    Other *Borello* Factors

#### i.    Distinct occupation or business

"If a worker is engaged in a distinct occupation or business, then that would suggest that the worker is an independent contractor rather than an employee." *Harris v. Vector Mktg. Corp.*, 656 F. Supp. 2d 1128, 1138-39 (N.D. Cal. 2009). Generally, where a putative employer does not preclude an individual from working elsewhere, courts assessing this factor have considered whether the putative employee is engaged in a distinct occupation or business providing others with the same or similar services as those provided to the alleged employer. *See, e.g., Antelope Valley Press v. Poizner*, 162 Cal. App. 4th 839, 854-55 (2008) (concluding that this factor supported employee status where there was no evidence that any of the defendant's newspaper carriers, some of whom also worked as landscapers and contract mail carriers and in an

independent internet business, "[held] themselves out as being an independent delivery service that happens to have [the defendant] as one of its customers."). *Cf. Hennighan*, 38 F. Supp. 3d at 1102 (concluding that this factor supported an independent contractor relationship where the plaintiff insurance agent also sold insurance for other agencies and held himself out as a self-employed insurance agent).

At the time of the AGC-012 jury study, Ms. Guynn-Neupane indisputably was employed on a full-time basis at the Employnet staffing agency, where her job duties and responsibilities included recruiting and interviewing individuals for job placements, calling clients, collecting time cards, and confirming that candidates were timely paid for the hours they worked.  Dkt. No. 54-3, Ex. B (Guynn-Neupane Dep. 13:8-14:19, 15:22-25).  No one contends that these job duties in any way resembled Ms. Guynn-Neupane's function as a mock juror for the AGC-012 focus group. Additionally, Ms. Guynn-Neupane testified in deposition that she would not have been able to manage an independent business of her own while working for Employnet.  Dkt. No. 48-4, ¶¶ 2-3, Ex. 1 (Guynn-Neupane Dep. 17:15-23, 18:4-7)).  Relatedly, Ms. Guynn-Neupane argues that she had an employment relationship with Magna insofar as she did not set her own prices or pay.  *See Duffey v. Tender Heart Home Care Agency, LLC*, 31 Cal. App. 5th 232, 257 (2019) (observing that the harvester-employees in *Borello* "incur no opportunity for 'profit' or 'loss;' like employees hired on a piecework basis, they  are simply paid by the size and grade of cucumbers they pick.").

More fundamentally, however, Magna contends that there is no such thing as "[p]rofessional focus group participants and/or mock jurors," and that even if there were such an occupation, the use of professional mock jurors is antithetical to Magna's social science research goals; any such professional would have been screened out from the AGC-012 jury study.  *See* Dkt. No. 64 at 6, 19; Dkt. No. 48-1 ¶ 16 and Ex. 1 at MLS000044.  Ms. Guynn-Neupane does not disagree.  *See* Dkt. No. 62 at 23 ("In a similar logic, Plaintiff has not held herself out as being an independent or professional mock juror.  Indeed, Defendants also admit that 'professional focus group research participants and/or mock jurors **do not exist** and such an occupation would be antithetical to the purpose of jury research studies.'").  This factor is neutral and does not weigh strongly in favor of either an independent contractor or employee finding.

40

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### ii.     Supervision

"If the type of work performed is usually done under an employer's direction, it suggests an employer-employee relationship; if the work is usually done by a specialist without supervision, it suggests an independent contractor relationship." *Hennighan,* 38 F. Supp. 3d at 1103 (citation omitted).  This factor is not particularly useful here, given that there is no serious dispute that there is no "mock juror" profession or occupation.  Nevertheless, courts have found this factor to be similar to the control factor.  *Sportsman v. A Place for Rover, Inc.,* — F. Supp. 3d —, No. 19-cv-03053-WHO, 2021 WL 3524114, at *14 (N.D. Cal. May 6, 2021).  For the reasons discussed above, Ms. Guynn-Neupane's only function as a mock juror was to provide her views and opinions, she admittedly maintained her independence and discretion in doing so, and Magna's unrefuted evidence demonstrates that it did not control Ms. Guynn-Neupane in that regard.  If applicable, this factor weighs in favor of an independent contractor relationship.

### iii.     Skill required

"Where no special skill is required of a worker, that fact supports a conclusion that the worker is an employee instead of an independent contractor."  *Harris*, 656 F. Supp. 2d at 1139; *see also Hennighan*, 38 F. Supp. 3d at 1103 (same).  This factor also is not particularly useful, as the circumstances of this case do not present the usual question of whether the role at issue requires skilled or unskilled labor; Ms. Guynn-Neupane acknowledged that Magna simply wanted the mock jurors' opinions, whatever they might be.  Dkt. No. 48-4, ¶ 3, Ex. 1 (Guynn-Neupane Dep. 49:8-15, 88:3-7).  The parties agree that no particular skill was needed for participation in the AGC-012 focus group.  Ms. Guynn-Neupane received no special training and did not do anything to prepare for the study.  Dkt. No. 48-1 ¶ 15; Dkt. No. 54-3, Ex. B (Guynn-Neupane Dep. 33:11-16).  Anyone who met the screening criteria was eligible to participate.  Dkt. No. 54-3, Ex. C (Crabtree Dep. 53:7-17); Dkt. No. 61-3, Ex. C (Crabtree Dep. 53:7-17).  Magna's suggestion that the demographic and background screening criteria are somehow comparable to specialized work skills is unconvincing.  Nevertheless, in view of Magna's social science research goals, Magna decidedly did not want mock jurors to be skilled research participants in any way, and it affirmatively screened out individuals who participated in "jury research" in the four years prior to

United States District Court
Northern District of California

the study or in any "focus group or market research study" in the 18 months prior to the study. Dkt. No. 48-1, Ex. 1 at MLS000044.  If applicable, this factor weighs in favor of an employee relationship.

### iv.    Instrumentalities and tools

A defendant's provision of the majority of the tools and instrumentalities or a place to work generally weighs in favor of an employment relationship.  *See Hennighan*, 38 F. Supp. 3d at 1103 (stating that this factor favors an independent contractor relationship where the defendant does not provide the majority of tools and instrumentalities and a place to work).  Magna does not dispute that it provided the location, as well as all of the tools and instructions for the mock jurors to provide their feedback.  For the reasons discussed above, however, this factor is much less significant in the context of this particular case where the unrefuted evidence demonstrates that Magna's provision of these tools and instructions were to ensure valid research results and that *no tools or instrumentalities were required* for Ms. Guynn-Neupane and the other mock jurors to formulate their opinions.  *See* Dkt. No. 48-2 ¶¶ 11, 25, 26, 28, 30, 31, 41, 48, 49, 61, 67.  This factor is neutral.

### v.    Length of time and right to discharge

"Where a worker is employed for a lengthy period of time, the relationship with the employer looks more like an employer-employee relationship."  *Harris*, 656 F. Supp. 2d at 1140. "The same is true where a worker may be discharged at will without cause."  *Id*. (citing *Antelope Valley Press*, 162 Cal. App. 4th at 854.  In the present case, there is no dispute that mock jurors were engaged for a single, one-day focus group, which favors an independent contractor relationship.  Ms. Guynn-Neupane argues that the short-lived service period does not necessarily preclude an employer-employee relationship.  However, her reliance on *Smith v. Super. Ct.*, 39 Cal. 4th 77 (2006) is misplaced, as the defendant in that case conceded that the plaintiff (a hair model hired for a one-day show) was its employee.  *See id*. at 81.  In any event, at the end of the one-day AGC-012 jury study, Magna paid Ms. Guynn-Neupane $260 and her relationship with Magna ended.  There is no indication that either side had any expectation that Ms. Guynn-Neupane would serve again as a research participant for Magna, and therefore the question of

United States District Court
Northern District of California

whether she could be discharged without cause did not arise.  Moreover, Magna designs its jury focus groups to avoid participants who engaged in "jury research" or in any "focus group or market research study" in the recent months or years preceding a particular study.  Dkt. No. 48-1, Ex. 1 at MLS000044.  This factor weighs strongly in favor of an independent contractor relationship.

### vi.        Method of payment

Where an individual is paid by the hour, such an arrangement suggests an employment relationship; but where an individual is paid by the job, the arrangement supports an independent contractor relationship.  *Hennighan*, 38 F. Supp. 3d at 1104; *Harris*, 656 F. Supp. 2d at 1140.  Magna paid Ms. Guynn-Neupane a lump sum of $260 for her participation in the jury research.  Dkt. No. 48-2 ¶ 69.  This factor weighs in favor of an independent contractor relationship.

### vii.       Part of the regular business

Magna says that jury focus groups are not always necessary for a particular engagement (Dkt. No. 48-1 ¶ 10) and that such studies comprise only a "small" portion of its overall business.  Ms. Guynn-Neupane notes that jury focus groups clearly are a part of Magna's business, as such studies are offered as part of Magna's suite of consulting services.  Dkt. No. 48-1 ¶ 7; Dkt. No. 54-3 Ex. D (Calzaretta Dep. 26:4-17).  She further argues that her function as a mock juror is integral to Magna's business because jury focus groups cannot be conducted without mock jurors.  *See* Ex. F (Janke Dep. 74:5-25, 78:11-23, 90:16-91:3, Ex. 13).

Magna's business is to provide litigation consulting advice to its clients.  While the administration of jury focus groups and the collection of data is part of Magna's regular business, Ms. Guynn-Neupane's function as a mock juror was neither of those things.  Her sole function as a mock juror was simply to provide the underlying data used by Magna to advise its clients.  *See* Dkt. No. 48-1 ¶¶ 23-24.  This factor favors an independent contractor relationship.

### viii.      Parties' belief

There is no contract or other evidence indicating that Magna told Ms. Guynn-Neupane whether she would function as an independent contractor or an employee in her role as a mock juror.  Dkt. No. 54-2 ¶ 4.  Ms. Guynn-Neupane says that she believed she was employed by

United States District Court
Northern District of California

1  Magna by virtue of her participation in the jury study, but she cites only to testimony stating that

2  she believed Wilkins was her employer.  *See* Dkt. No. 62 at 29; Dkt. No. 54-3, Ex. B (Guynn-

3  Neupane Dep. 94:24-95:25).  In any event, the label placed by the parties on their relationship is

4  not dispositive.  *Borello*, 48 Cal. 3d at 349.  This factor is neutral.

5  **c.      Summary**

6        In sum, the evidence does not raise a triable issue of fact that Magna controlled Ms.

7  Guynn-Neupane's performance of her role as a mock juror to such an extent that she was Magna's

8  employee.  Fundamentally, Magna was conducting social science research, and Ms. Guynn-

9  Neupane's role as a mock juror was simply to provide her unvarnished views and opinions.

10  Although Magna did control the method and means by which Ms. Guynn-Neupane received

11  stimuli and delivered her views and opinions, those controls related only to Magna's goals of

12  ensuring accurate and valid research results.  Magna did not assume control of Ms. Guynn-

13  Neupane's independent judgment and discretion in providing her feedback to Magna.  Analysis of

14  the other *Borello* factors shows that most factors favor an independent contractor relationship or

15  are neutral.  "'Even if one or two of the individual factors might suggest an employment

16  relationship, summary judgment is nevertheless proper when, as here, all the factors weighed and

17  considered as a whole establish that [the plaintiff] was an independent contractor and not an

18  employee . . ..'"  *Hennighan*, 38 F.Supp.3d at 1098 *Id.* (quoting *Arnold v. Mut. of Omaha Ins. Co.*,

19  202 Cal.App.4th 580, 590 (2011)).  Based on the foregoing, under *Borello*, Ms. Guynn-Neupane is

20  an independent contractor with respect to Magna.

21        **2.      Wilkins**

22        To the extent Ms. Guynn-Neupane can be said to have had any sort of relationship with

23  Wilkins at all—independent contractor or otherwise—the *Borello* factors favor an independent

24  contractor relationship.

25  **a.      Right to Control**

26        The unrefuted evidence demonstrates that Wilkins did not exercise any control over the

27  manner and means of any aspect of Ms. Guynn-Neupane's service as a mock juror, much less that

28  it had any right to do so.  Indeed, as discussed above, the entire focus group was planned and

United States District Court
Northern District of California

administered by Magna.  *See* Dkt. No. 52-2 ¶¶ 25-26, 30, 36-38, 41, 43, 45-46, 48-49, 52, 59, 64, 67; Dkt. No. 52-3 ¶¶ 11-20.  Other than advertising the study on social media, reading Magna's screener script to ascertain the eligibility of those who responded to the ad, and sending follow-up notices to those who agreed to participate in the study, Wilkins had no role in planning or conducting the study.  Dkt. No. 52-1 ¶¶ 9-10, 13, 15-23; Dkt. No. 52-2 ¶¶ 6-7, 9, 14-15; Dkt. No. 61-3, Ex. C (Crabtree Dep. 53:7-21, 56:19-58:14, 63:4-64:20, 66:2-20, Ex. 2); Ex. D (Calzaretta Dep. 75:15-76:5, 76:11-17, 96:3-20).  Although Wilkins did have some additional communications with Ms. Guynn-Neupane, those communications were initiated by Ms. Guynn-Neupane to advise that she was running late for the study, and later to say that she had lost her check.  Dkt. No. 52-1 ¶¶ 20-21, Ex. 4.

Ms. Guynn-Neupane's arguments concerning Wilkins's alleged control are based primarily on the "instructions" Wilkins read from Magna's screener script, including that in order to receive full payment, she needed to show up on time for the focus group and participate in the entire research session, and that she would not be paid if she chose to leave the session for any reason. Dkt. No. 61-3, Ex. C (Crabtree Dep. 64:25-65:12, Ex. 2 at MLS000048).  Additionally, she argues that in its follow-up communications with participants, Wilkins reiterated these and other instructions, including that she should stay on site for the entire session (including breaks) and that to participate in the focus group, she needed to bring some form of identification with her on the day of the study.  Dkt. No. 61-3, Ex. B (Guynn-Neupane Dep., Ex. 2); Ex. C (Crabtree Dep. Ex. 2 at MLS000048); Ex. D (Calzaretta Dep. 151:24-152:23, 173:6-14).  Ms. Guynn-Neupane also suggests that Wilkins "pressured" her to follow-through on her commitment to participate in the study by noting, "Your commitment to participate in this study is very important, and we rely on your participation to make each research study a success."  Dkt. No. 61-3, Ex. B (Guynn-Neupane Dep., Ex. 2).  As for her post-study communications with Wilkins about her lost check, Ms. Guynn-Neupane says that because she was not given Magna's contact information, she "could only reach out to Wilkins to request a reissue of her check, and thus was subjected to Wilkins' discretion to facilitate a resolution and reissue of a new check."  Dkt. No. 61 at 19.

None of Ms. Guynn-Neupane's cited evidence establishes, or even raises, a triable issue

United States District Court
Northern District of California

1    that Wilkins had any meaningful control over the manner and means of Ms. Guynn-Neupane's

2    provision of feedback as a participant in the AGC-012 focus group, or any involvement in the

3    planning and administration of that study.  Wilkins's unrefuted testimony is that it had no input or

4    involvement in preparing the screener.  *See* Dkt. No. 61-3, Ex. C (Crabtree Dep. 64:15-17).  There

5    is no evidence that Wilkins maintained any expectations or knowledge regarding the study beyond

6    its recruitment efforts, or that it had any right to impose consequences on Ms. Guynn-Neupane or

7    anyone else based on their participation in the focus group.  Dkt. No. 52-1 ¶ 23.  But for the fact

8    that Ms. Guynn-Neupane contacted Wilkins regarding her tardiness and lost check, Wilkins's

9    relationship with her would have ended once she arrived at the focus group.  Dkt. No. 52-1 ¶¶ 19-

10   22.  In any event, nothing about those communications concerning her lost check demonstrate that

11   Wilkins had any control over the study or Ms. Guynn-Neupane's function as a mock juror.

12          Citing *Duffey*, Ms. Guynn-Neupane nonetheless argues that Wilkins's limited role as a

13   recruiter for the AGC-012 study does not preclude a finding of an employer-employee

14   relationship.  Her reliance on *Duffey* is misplaced.  In *Duffey*, the defendant was "a caregiver

15   placement agency" that was "engaged in the business of qualifying, screening and referring

16   caregivers," such as the plaintiff, and "matching the right caregivers to" defendant's clients.  31

17   Cal. App. 5th at 238.  In reviewing the control factor under *Borello*, the *Duffey* court noted that

18   "there is evidence that [the defendant] selects clients, performs the initial assessment of the

19   clients' needs, matches caregivers according to the clients' needs, negotiates the amount charged

20   to the client, and determines what portion of that amount will be paid to the caregiver," and that

21   such facts, if established "constitute substantial control over the details of the caregiving

22   business."  *Id*. at 255.  By contrast, in the present case there is no evidence that Wilkins exercised

23   anything approaching the same level of control in the recruiting process for the AGC-012 focus

24   group.  While acknowledging that the screener script was prepared by Magna, Ms. Guynn-

25   Neupane argues that "it is up to the Wilkins' recruiters' subjective assessment and determination

26   as to whether the participants' responses actually line up with Magna's criteria."  Dkt. No. 61 at

27   20.  Even a cursory review of the screener script, however, indicates that there was no subjective

28   assessment involved at all.  Magna's screening questions are simple "yes or no" type questions

about an individual's background, including whether or not an individual is a United States citizen, holds a valid California driver's license, or is a Monterey County resident. And the screener script itself directs Wilkins when to "terminate" a particular respondent from the recruiting process depending on their answers to the questions. For example, "No" answers to any of the questions about U.S. citizenship, California identification, or Monterey County residence would disqualify the individual from participation in the study. Dkt. No. 61-3, Ex. C (Crabtree Dep., Ex. 2 at MLS000043).

This factor weighs in favor of an independent contractor relationship.

### b.    Other *Borello* factors

In view of Wilkins's limited role in the recruiting process for the study, the remaining *Borello* factors also either favor an independent contractor relationship or are neutral.

### i.    Distinct occupation

As discussed above, there is no serious dispute that there is no such thing as a professional "mock juror." Dkt. No. 52 at 6; Dkt. No. 52-3 ¶¶ 13, 16; Dkt. No. 52-2 ¶ 15, Ex. 1; Dkt. No. 61 at 11, 21; Dkt. No. 66 at 8. This factor is neutral.

### ii.    Supervision

As discussed above, this factor is similar to the right-to-control test. *Sportsman,* — F. Supp. 3d —, 2021 WL 3524114, at *14. For the reasons discussed above, this factor favors an independent contractor relationship.

### iii.    Skill required

As with Magna, the parties agree that no special skill was required of Ms. Guynn-Neupane to participate in the study, and indeed Magna did not want participants who were skilled or previously participated in jury research. Dkt. No. 52-3 ¶¶ 11-20; Dkt. No. 61-3, Ex. B (Guynn-Neupane Dep. 33:11-16); Dkt. No. 61-3, Ex. C (Crabtree Dep. 53:7-14, 66:2-20; Ex. 2); Dkt. No. 61-3, Ex. D (Calzaretta Dep. 97:13-24). To the extent this factor applies at all, it favors an employer-employee relationship.

47

1

United States District Court
Northern District of California

#### iv.     Instrumentalities and tools; Right to discharge; Length of time; Method of payment

2       Wilkins did not provide the location or any tools or instrumentalities for Ms. Guynn-

3   Neupane and other mock jurors to provide their feedback for the study, and the unrefuted evidence

4   shows that Wilkins had no role in planning or conducting the study, including the length of the

5   study or the amount and method of payment.  Nor is there any evidence indicating that Wilkins

6   retained the right to discharge any participant from the study.  Finally, it is undisputed that

7   Wilkins exercised no control over participants' opinions.  Dkt. No. 52-1 ¶¶ 6-23.  All of these

8   factors favor an independent contractor relationship.

#### v.     Part of the regular business

10      Wilkins maintains that recruiting focus group participants is a small portion of its business

11  and that this factor therefore favors an independent contractor finding.  Dkt. No. 52-1 ¶ 5.  Ms.

12  Guynn-Neupane contends that her services as a mock juror are integral to Wilkins's business

13  because without any research participants to recruit, Wilkins would not be able to fulfill its

14  contractual obligations to Magna and other companies.  Dkt. No. 61 at 26; Dkt. No. 52-1 ¶¶ 3, 4;

15  Dkt. No. 61-3, Ex. D (Crabtree Dep. at 34:21-35:7).  While Wilkins's recruiting services are part

16  of the jury research services Wilkins regularly offers to its clients, Wilkins is primarily a data

17  collection agency.  Dkt. No. 52-1 ¶ 3.  And data collection essentially is the service Wilkins

18  provides when it recruits for jury focus groups.  Ms. Guynn-Neupane's function as a mock juror

19  was not to gather data, but simply to provide it in the form of her personal views and opinions and

20  responses to questions about her background and experiences.  This factor favor an independent

21  contractor relationship.

#### vi.     Parties' belief

23      Ms. Guynn-Neupane avers that at no point during the recruiting process did Wilkins

24  affirmatively say whether she was a Wilkins employee or independent contractor.  Nor is there any

25  evidence that she signed any agreement as to her employee or independent contractor status.  Dkt.

26  No. 61-2 ¶ 4.  In deposition, she testified that she believed Wilkins was her employer.  *See* Dkt.

27  No. 62 at 29; Dkt. No. 61-3, Ex. B (Guynn-Neupane Dep. 94:24-95:25).  Even so, the label placed

28  by the parties on their relationship is not dispositive.  *Borello*, 48 Cal. 3d at 349.  This factor is

neutral.

### c.      Summary

In sum, Wilkins exercised little or no meaningful control over any aspect of the AGC-012 jury study, and the *Borello* factors, including the primary control factor, weigh in favor of a finding that Ms. Guynn-Neupane properly is classified as an independent contractor with respect to Wilkins.

### E.      The ABC Test

Alternatively, defendants are entitled to summary judgment even if the ABC test applies.

Under the ABC test, "a person providing labor or services for remuneration" is presumed to be an employee, rather than an independent contractor, unless the hiring entity establishes that all of the following conditions are satisfied:

> (A) The person is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact.
>
> (B) The person performs work that is outside the usual course of the hiring entity's business.
>
> (C) The person is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed.

Cal. Labor Code § 2775(b)(1); see also *Dynamex*, 4 Cal. 5th at 916-17.

### 1.      Magna

#### a.      Control and direction

Part A of the ABC test considers whether a worker is subject, either as a matter of contractual right or in actual practice, to the type and degree of control a business typically exercises over its employees. *Dynamex*, 4 Cal. 4th at 958. "[D]epending on the nature of the work and overall arrangement between the parties," it is not necessary for a business to "control the precise manner or details of the work in order to be found to have maintained the necessary control that an employer ordinarily possesses over its employees, but does not possess over a genuine independent contractor." *Id*. Here, the parties reiterate their arguments regarding the parameters Magna established for the administration of the AGC-012 focus group. Dkt. No. 64 at 21-22, Dkt. No. 62 at 19-22. The Court finds that Magna has met its burden with respect to Part A

United States District Court
Northern District of California

United States District Court
Northern District of California

1  for the same reasons stated above with respect the *Borello* "control" factor.  *See Sportsman,* 2021

2  WL 3524114 at *13 (concluding that Part A of the ABC test and the *Borello* "control" factor

3  favored the defendant for the same reasons); *see also, e.g., Garcia v. Border Transp. Group, LLC*,

4  28 Cal. App. 5th 558, 569 (2018) ("Part A involves *Borello*'s common law 'control' test[.]");

5  *Curry v. Equilon Enterprises, LLC*, 23 Cal. App. 5th 289, 315 (2018), *as modified on denial of*

6  *reh'g* (May 18, 2018) (finding no triable fact issue with respect to Part A of the ABC test for the

7  same reasons stated regarding the *Borello* "control" factor).

8  **b.     Hiring entity's business**

9      Part B of the ABC test considers whether an individual provides services to a business "in

10  a role comparable to that of an employee, rather than in a role comparable to that of a traditional

11  independent contractor," *Dynamex*, 4 Cal. 5th at 959, and "reflects the distinction between

12  workers who are truly independent contractors and those whose work involves the hiring entity's

13  usual course of business," *Vazquez v. Jan-Pro Franchising Int'l, Inc.*, 986 F.3d 1106, 1125 (9th

14  Cir. 2021).  "More specifically, Prong B requires the hiring entity to establish that it was not

15  engaged in the same usual course of business as the putative employee." *Vazquez*, 986 F.3d at

16  1125.  For example, an outside plumber repairing a leak at a retail store or an outside electrician

17  installing a new electrical line at the store are not part of the store's usual course of business.  But

18  seamstresses hired by a clothing manufacturer to sew clothes that the manufacturer intends to sell,

19  and cake decorators hired by a bakery on a regular basis to decorate the bakery's custom-designed

20  cakes can reasonably be viewed as providing services as the bakery's employees.  *Dynamex*, 4

21  Cal. 5th at 959-60.

22      "Analytically, courts have framed the Prong B inquiry in several ways."  *Vazquez*, 986

23  F.3d at 1125.  "They have considered whether the work of the employee is necessary to or merely

24  incidental to that of the hiring entity, whether the work of the employee is continuously performed

25  for the hiring entity, and what business the hiring entity proclaims to be in."  *Id*.  In considering

26  whether the putative employee is "necessary" or "incidental" to the hiring entity's business, the

27  inquiry can in some cases "be conducted through a common-sense observation of the nature of the

28  businesses," while in other cases "courts view the 'necessary' versus 'incidental' distinction in

50

1    more economic terms." *Id*. at 1125-26.

2           Here, a common-sense observation of the nature of Magna's litigation services business

3    shows that Ms. Guynn-Neupane did not provide services necessary to Magna's business.  Jury

4    focus groups comprise only a portion of Magna's consulting, deposition, and record retrieval

5    services.  *See* Dkt. No. 48-1 ¶¶ 7-8; *see also* Dkt. No. 62 at 15 (noting that Magna's website touts

6    "various services including court reporting, records retrieval, interpretation services, trial

7    presentation services, and jury consulting.").  Moreover, Magna's unrefuted evidence is that it is

8    not always necessary to conduct a jury focus group for any particular client engagement.  Dkt. No.

9    48-1 ¶ 10.  Ms. Guynn-Neupane argues that without interested research participants, Magna's jury

10   consulting business would likely cease entirely.  Dkt. No. 62 at 22.  While it is true, as Ms.

11   Guynn-Neupane notes, that jury focus groups cannot function without mock jurors, the fact

12   remains that in the consulting portion of its business, Magna's function is to provide litigation

13   advice to its clients.  To do so, Magna employs consultants who create and implement a plan for a

14   particular project and conduct the necessary analyses and assessments that are provided to

15   Magna's clients.  Dkt. No. 48-1 ¶¶ 23-30.[18]  In her role as a mock juror, Ms. Guynn-Neupane did

16   not collect or analyze data or provide any sort of consulting service.  She simply was a test subject

17   providing data.  Any interested individual who met certain demographic and other background

18   criteria was eligible to participate in the focus group.  Dkt. No. 54-3, Ex. C (Crabtree Dep. 53:7-

19   17).  There are no "right" or "wrong" responses, and Magna values active and disengaged mock

20   jurors alike.  *See* Dkt. No. 48-1 ¶¶ 19-20; Dkt. No. 48-2 ¶¶ 41, 61; Dkt. No. 48-4, Ex. 1 (Guynn-

21   Neupane Dep. 49:8-15, 88:3-7); Dkt. No. 54-3, Ex. E (Calzaretta Dep. 215:22-25, 216:3-8).

22   Although the mock juror's role is not as clearly "incidental" to Magna's business as that of a

23   plumber hired to repair a leak at a retail store, Magna has met its burden to show that mock jurors

24   do not provide services necessary to its business; rather mock jurors simply provide data, in the

25   form of opinions, that in turn enables Magna to provide services to its clients.

26          Similarly, in "economic terms," Magna pays focus group participants a flat fee.  There is

27

28   [18] Ms. Guynn-Neupane's relevance objections to this portion of Mr. Calzaretta's declaration are
     overruled.  Fed. R. Evid. 402.

United States District Court
Northern District of California

1    no indication that Magna's revenues are affected by the responses mock jurors provide or how

2    actively they participate in the process.

3        Further, there is no question that Ms. Guynn-Neupane did not continuously perform any

4    services for Magna; her relationship with Magna was limited to a single focus group.  Indeed,

5    Magna structures its focus groups in way that is designed to prevent an individual from

6    participating in Magna's focus groups on a continuous or repeated basis.  Dkt. No. 48-1 ¶ 16 and

7    Ex. 1 at MLS000044.

8        Magna has satisfied its burden with respect to Part B of the ABC test.

9                          c.        **Customary occupation**

10       Part C of the ABC test examines whether an individual "fits the common conception of an

11   independent contractor."  *Garcia*, 28 Cal. App. 5th at 572.  "As a matter of common usage, the

12   term 'independent contractor,' when applied to an individual worker, ordinarily has been

13   understood to refer to an individual who independently has made the decision to go into business

14   for himself or herself" and "generally takes the usual steps to establish and promote his or her

15   independent business—for example, through incorporation, licensure, advertisements, routine

16   offerings to provide the services of the independent business to the public or to a number of

17   potential customers, and the like."  *Dynamex*, 4 Cal. 5th at 962.  "*Dynamex* requires more than

18   mere capability to engage in an independent business."  *Garcia*, 28 Cal. App. 5th at 575.  Thus,

19   "[t]he fact that a company has not prohibited or prevented a worker from engaging in such a

20   business is not sufficient to establish that the worker has independently made the decision to go

21   into business for himself or herself."  *Dynamex*, 4 Cal. 5th at 962.  "Accordingly, in order to

22   satisfy part C of the ABC test, the hiring entity must prove that the worker is customarily engaged

23   in an independently established trade, occupation, or business."  *Id*. at 963.

24       Of all the parts of the ABC test, Part C is perhaps is the most ill-suited to the research

25   context of the present case.  The undisputed evidence demonstrates that at the time of the AGC-

26   012 focus group, Ms. Guynn-Neupane was not customarily engaged in an independently

27   established trade, occupation, or business as a research participant or mock juror.  Critical to the

28   analysis here, however, is that there is also no serious dispute that there is no such thing as a

United States District Court
Northern District of California

1   professional "mock juror," and that Magna designs its studies to screen out individuals who

2   previously participated in other market research or jury study.  *See* Dkt. No. 64 at 6, 19; Dkt. No.

3   48-1 ¶ 16, Ex. 1; Dkt. No. 62 at 23.  For that reason, and to the extent *Dynamex* applies at all

4   within the particular context of the present case, the Court concludes that Magna has met its

5   burden with respect to Part C of the ABC test.

6              **2.**      **Wilkins**

7       For many of the same reasons discussed above, Wilkins has also met its burden under the

8   ABC test to establish that Ms. Guynn-Neupane is an independent contractor, rather than an

9   employee.

10      The undisputed evidence establishes that Wilkins did not maintain the necessary control

11  that an employer ordinarily possesses over its employees.  Magna planned and administered the

12  focus group.  Aside from advertising the study and recruiting participants according to Magna's

13  criteria, Wilkins had no role in planning or conducting the study, including the length of the study

14  or the amount and method of payment.  *See* Dkt. No. 52-1 ¶¶ 9-10, 13, 15-23; Dkt. No. 52-2 ¶¶ 6-

15  7, 9, 14-15, 25-26, 30, 36-38, 41, 43, 45-46, 48-49, 52, 59, 64, 67; Dkt. No. 52-3 ¶¶ 11-20; Dkt.

16  No. 61-3, Ex. C (Crabtree Dep. 53:7-21, 56:19-58:14, 63:4-64:20, 66:2-20, Ex. 2); Dkt. No. 61-3,

17  Ex. D (Calzaretta Dep. 75:15-76:5, 76:11-17, 96:3-20).

18      Wilkins's unrefuted evidence is that it is "primarily a data collection agency that gathers

19  and compiles healthcare data from hospitals, physician's offices, and medical facilities," and also

20  provides "roundtable focus group[s] for consumers, shop-along market research, product

21  placement, research panels on education, consumer issues, and politics, political research, and jury

22  research" services.  Dkt. No. 52-1 ¶¶ 3, 4.  In her role as a mock juror, Ms. Guynn-Neupane

23  performed no such functions; she simply provided data in the form of responses confirming

24  aspects of her background information, as well as personal views and opinions.  While Ms.

25  Guynn-Neupane argues that research participants are necessary for Wilkins to be able to fulfill its

26  contractual obligations to companies like Magna, Wilkins's mock juror recruiting activities

27  comprise only 11% of Wilkins's overall business operations.  Dkt. No. 61-3, Ex. C (Crabtree Dep.

28  at 35:2-7, 74:12-75:14).  There is no evidence suggesting that Wilkins's business depends on the

United States District Court
Northern District of California

United States District Court
Northern District of California

availability of mock jurors.

As with Magna, mock jurors do not continuously perform services for Wilkins. Ms. Guynn-Neupane's relationship with Wilkins was even more limited than her relationship with Magna. Magna structures its focus groups in way that is designed to prevent an individual from participating in Magna's focus groups on a continuous or repeated basis. *See* Dkt. No. 52-3 ¶ 16 and Ex. 1 at MLS000044.

While the undisputed evidence demonstrates that at the time of the AGC-012 focus group, Ms. Guynn-Neupane was not customarily engaged in an independently established trade, occupation, or business as a research participant or mock juror, there is no serious dispute that no such profession exists and that Magna designs its studies to screen out individuals who recently participated in other market research or jury studies. *See* Dkt. No. 52-3 ¶ 16, Ex. 1; Dkt. No. 61 at 11, 21.

For these reasons, and to the extent *Dynamex* applies at all within the particular context of the present case, the Court concludes that Wilkins has met its burden with respect to Parts A, B and C of the ABC test.

## V.    CONCLUSION

Based on the foregoing, Magna's motion for summary judgment and Wilkins's motion for summary judgment are granted and Ms. Guynn-Neupane's motion for class certification is denied as moot. The Clerk shall enter judgment accordingly and close this file.

**IT IS SO ORDERED.**

Dated: September 30, 2021

VIRGINIA K. DEMARCHI
United States Magistrate Judge

54